723 F.2d 1394
 UNITED STATES of America, Plaintiff-Appellee,
and
Klamath Indian Tribe, Plaintiff-Intervenor-Appellee,
v.
Ben ADAIR, et al., Defendants-Appellants,
and
The State of Oregon, Defendant-Intervenor-Appellant.
 Nos. 80-3229, 80-3245, 80-3246 and 80-3257.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 6, 1981.
July 15, 1983.
Resubmitted Nov. 14, 1983.
Decided Nov. 15, 1983.
As Modified on Denial of Rehearing
Jan. 24, 1984.
Withdrawn from Submission
 
 Richard B. Collins, Kim Jerome Gottschalk, Boulder, Colo., for plaintiff-intervenor-appellee.
 Stephen D. Dillon, Santa Fe, N.M., amicus curiae, for New Mexico.
 Robert L. Klarquist, Dept. of Justice, Washington, D.C., for U.S.
 Charles F. Adams, Jere M. Webb, Steol, Rives, Bole, Fraser & Wyse, Portland, Or., Theodore R. Conn, Lakeview, Or., Jan P. Londahl, Asst. Atty. Gen., Salem, Or., for State of Or.
 Andrew P. Kerr, David Sweeney, Gilbertson, Brownstein, Sweeney, Kerr & Grim, Portland, Or., for defendants-appellants.
 Appeal from the United States District Court for the District of Oregon.
 Before KILKENNY, GOODWIN and FLETCHER, Circuit Judges.
 FLETCHER, Circuit Judge:
 
 
 1
 In 1975 the United States filed suit in district court, pursuant to 28 U.S.C. Sec. 1345 (1976), for a declaration of water rights within an area whose boundaries roughly coincide with the former Klamath Indian Reservation. The suit named as defendants some 600 individual owners of land within the former reservation. The Klamath Tribe intervened as a plaintiff and the State of Oregon as a defendant.
 
 
 2
 After a trial on stipulated facts, supplemented by exhibits and affidavits, the district court issued an opinion declaring: (1) the Tribe and its members have water rights sufficient to maintain their treaty rights to hunt and fish on the former reservation; (2) individual Indian landowners have water rights, subject to the paramount rights of the Tribe, sufficient to maintain agriculture on their lands; and, (3) individual non-Indian landowners could acquire the water rights of their predecessor Indian landowners. The State of Oregon and the individual landowners filed a timely appeal from the district court decision, as did the United States and the Tribe.
 
 
 3
 Our jurisdiction rests on 28 U.S.C. Sec. 1291 (1976). We modify the district court's judgment in part, and as modified, affirm.
 
 
 4
 * BACKGROUND
 
 
 5
 A. History of the Litigation Area.
 
 
 6
 This suit concerns water rights in a portion of the Williamson River watershed. The Williamson River is part of the larger Klamath River watershed of Southern Oregon and Northern California. That part of the Williamson River watershed involved in this litigation drains an area of low, forested mountains, flat, grassy valleys and marshes east of the Cascade Range in south-central Oregon. The average rainfall in the area is low; summers are dry and winters are severe.
 
 
 7
 The major feature of the subject area is a large flat valley historically known as the Klamath Marsh. As the Williamson flows into the north end of this valley, it spreads out and soaks into the porous, pumice soil. During the wet months of the year, open water and aquatic vegetation cover the lower portion of the valley, the water to a depth of a few feet. The remainder of the valley is grassland. During dry summer months, as the water recedes, the grassland in the valley increases. This fluctuating marsh has been an important feeding and resting area for migratory ducks, geese and other waterfowl for thousands of years. In addition, the Marsh has always supported a variety of other indigenous wildlife. More recently, large parts of the Klamath Marsh have been used for grazing cattle.
 
 
 8
 The Klamath Indians have hunted, fished, and foraged in the area of the Klamath Marsh and upper Williamson River for over a thousand years. In 1864 the Klamath Tribe entered into a treaty with the United States whereby it relinquished its aboriginal claim to some 12 million acres of land in return for a reservation of approximately 800,000 acres in south-central Oregon. This reservation included all of the Klamath Marsh as well as large forested tracts of the Williamson River watershed. Treaty between the United States of America and the Klamath and Moadoc Tribes and Yahooskin Band of Snake Indians, Oct. 14, 1864, 16 Stat. 707. Article I of the treaty gave the Klamath the exclusive right to hunt, fish, and gather on their reservation. Id.; Kimball v. Callahan, 493 F.2d 564, 566 (9th Cir.), cert. denied, 419 U.S. 1019, 95 S.Ct. 491, 42 L.Ed.2d 292 (1974) (Kimball I.) Article II provided funds to help the Klamath adopt an agricultural way of life. 16 Stat. 708.
 
 
 9
 For 20 years, until 1887, the Klamath lived on their reservation under the terms of the 1864 treaty. In 1887 Congress passed the General Allotment Act, ch. 119, 24 Stat. 388 (1887) (current version at 25 U.S.C. Secs. 331-34, 348, 349, 381 (1976)), which fundamentally changed the nature of land ownership on the Klamath Reservation. Prior to the Act, the tribe held the reservation land in communal ownership. Pursuant to the terms of the Allotment Act, however, parcels of tribal land were granted to individual Indians in fee. Under the allotment system, approximately 25% of the original Klamath Reservation passed from tribal to individual Indian ownership. Over time, many of these individual allotments passed into non-Indian ownership.
 
 
 10
 The next major change in the pattern of land ownership on the Klamath Reservation occurred in 1954 when Congress approved the Klamath Termination Act. Act of Aug. 13, 1954, c. 732, Sec. 1, 68 Stat. 718 (codified at 25 U.S.C. Secs. 564-564w (1976)). Under this Act, tribe members could give up their interest in tribal property for cash. A large majority of the tribe chose to do this. In order to meet the cash obligation, in 1961, the United States purchased much of the former Klamath Reservation. The balance of the reservation was placed in a private trust for the remaining tribe members. See Kimball I, 493 F.2d at 567 (describing termination process); Klamath and Modoc Tribes v. United States, 436 F.2d 1008, 1010-13 (Ct.Cl.) (same), cert. denied, 404 U.S. 950, 92 S.Ct. 271, 30 L.Ed.2d 267 (1971). In 1973, to complete implementation of the Klamath Termination Act, the United States condemned most of the tribal land held in trust. Payments from the condemnation proceeding and sale of the remaining trust land went to Indians still enrolled in the tribe. This final distribution of assets essentially extinguished the original Klamath Reservation as a source of tribal property.
 
 
 11
 Even though the Klamath Tribe no longer holds any of its former reservation, the United States still holds title to much of the former reservation lands. In 1958 the Government purchased approximately 15,000 acres of the Klamath Marsh, the heart of the former reservation, to establish a migratory bird refuge under the jurisdiction of the United States Fish and Wildlife Service. Pub.L. No. 85-731, 72 Stat. 816 (1958) (codified as amended at 25 U.S.C. Sec. 564w-1 (1976)). In 1961 and again in 1973, the Government purchased large forested portions of the former Klamath Reservation. This forest land became part of the Winema National Forest under the jurisdiction of the United States Forest Service. 25 U.S.C. Secs. 564w-1(d), 564w-2 (1976). By these two purchases, the Government became the owner of approximately 70% of the former reservation lands. The balance of the reservation is in private, Indian and non-Indian, ownership either through allotment or sale of reservation lands at the time of termination.
 
 
 12
 B. Proceedings in the District Court.
 
 
 13
 In September of 1975, the United States filed suit in federal district court seeking a declaration of water rights within the Williamson River drainage above the "reef" near Kirk, Oregon.[1] In January of 1976, the State of Oregon initiated formal proceedings under state law to determine water rights in the Klamath Basin including that portion of the Williamson River drainage covered by the Government's suit. See Or.Rev.Stat. Secs. 539.010-539.110 (1979). Later in 1976, the State of Oregon moved to intervene as a defendant in the United States suit. The Klamath Tribe also moved to intervene in the federal suit as a plaintiff. Both motions were granted. Subsequently, the State, joined by the individual defendants, moved for dismissal of the federal court water rights adjudication in favor of the state proceeding under the rule announced by the Supreme Court in Colorado River Water Conservation District v. United States, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). The district court in effect denied the defendants' motion to dismiss when on November 14, 1977, it entered a Pretrial Order to govern the conduct of the federal suit.
 
 
 14
 This order, in listing the issues to be decided, significantly limited the nature of the federal proceeding. The district court did not agree to decide any question concerning the actual quantification of water rights. The questions listed fell within three basic categories: (1) whether water rights had been reserved for the use of Klamath reservation lands in the 1864 treaty; (2) whether such rights passed to the Government and to private persons who subsequently took fee title to reservation lands; and (3) what priorities should be accorded the water rights of each of the present owners and users of former reservation lands. Although the district court agreed to specify the proper method for measuring the reserved water rights originally attached to the reservation, it declined to quantify that measure. Rather, it declared that "[a]ctual quantification of the rights to the use of waters of the Williamson River and its tributaries within the litigation area will be left for judicial determination, consistent with the decree in this action, by the State of Oregon under the provisions of 43 U.S.C. Sec. 666 [the McCarran Amendment]."
 
 
 15
 Pursuant to the terms of the Pretrial Order, the district court determined the priority of water rights among the litigants as follows: (1) the Klamath Tribe Indians have a water right, with a priority date of time immemorial, "to as much water on the Reservation lands as they need to protect their hunting and fishing rights," United States v. Adair, 478 F.Supp. 336, 345 (D.Or.1979); (2) this Indian water right is coterminous with the water right claimed by the United States as a successor land owner, and therefore renders it unnecessary to determine whether the right has been transferred to the United States, id. at 347; (3) those lands now owned by the United States outside the former reservation carry a water right, with priority from the date of withdrawal from the public domain, sufficient to meet the forest purposes of the withdrawal, id. at 348; (4) individual Indians who still own former reservation lands have water rights, with priority dating from the 1864 treaty, "to use water essential to their agricultural needs ... subject to the superior right of other Indians to use the water for the preservation of hunting and fishing ...," id. at 346; and, (5) individual non-Indians who own former reservation lands have a water right "to water for the actual acreage under irrigation when [they received] title from [their] Indian predecessor[s]. The priority date of that right is 1864. [These individual non-Indians also acquired] a right, with an 1864 priority date, to water for additional acreage which ... with reasonable diligence, may [be] place[d] under irrigation." Id. at 349.
 
 
 16
 The State of Oregon and the individual defendants appeal from the district court's decision. They argue, first, that the district court should have dismissed the federal suit, and second, that the district court erroneously awarded water rights to the Tribe and the United States as the Tribe's successor. The United States and the Tribe also appeal; they argue that the district court erroneously awarded water rights to non-Indian successors of Indian landowners.
 
 
 17
 We first consider whether the district court should have dismissed this suit under the Colorado River doctrine.
 
 II
 COLORADO RIVER ABSTENTION
 
 18
 A. Background: The Colorado River Doctrine.
 
 
 19
 In Colorado River Water Conservation District v. United States, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), the Supreme Court upheld a district court's dismissal of an action for federal adjudication of water rights in favor of a contemporaneous state adjudication. In Arizona v. San Carlos Apache Tribe of Arizona, the Court, following Colorado River, made clear its view that in most cases a federal court should defer to a contemporaneous and comprehensive state water rights adjudication because "water rights adjudication is a virtually unique type of proceeding, and the McCarran Amendment is a virtually unique federal statute." --- U.S. at ----, 103 S.Ct. at 3216. See Arizona v. San Carlos Apache Tribe of Arizona, --- U.S. ----, ----, 103 S.Ct. 3201, 3216, 77 L.Ed.2d 837 (1983). The course of our review and analysis in this case is necessarily determined by the factors found controlling in those two cases.
 
 
 20
 Plainly, the district court had jurisdiction. Federal courts have jurisdiction under 28 U.S.C. Sec. 1345 (1976) to adjudicate the water rights claims of the United States. Cappaert v. United States, 426 U.S. 128, 145-46, 96 S.Ct. 2062, 2072-73, 48 L.Ed.2d 523 (1976). While the Court in Colorado River pointed out that "state court[s] [have] jurisdiction over Indian water rights under the [McCarran] Amendment," 424 U.S. at 809, 96 S.Ct. at 1242, this statement does not imply that state courts have exclusive jurisdiction over such rights. In fact, the Colorado River Court made this point explicit when it held that "the McCarran Amendment in no way diminished federal-district-court jurisdiction under Sec. 1345 and ... the District Court had jurisdiction to hear this case." Id. In San Carlos Apache Tribe, the Supreme Court reaffirmed that the McCarran Amendment did not do away with federal jurisdiction over water rights claims brought under section 1345 or section 1362. See --- U.S. at ---- & n. 10, 103 S.Ct. at 3210 & n. 10.[2]
 
 
 21
 The Colorado River doctrine is an exception to the general rule that where a district court has statutory jurisdiction, it has a "virtually unflagging obligation" to exercise that jurisdiction. Colorado River, 424 U.S. at 817, 96 S.Ct. at 1246; see England v. Board of Medical Examiners, 375 U.S. 411, 415, 84 S.Ct. 461, 464-65, 11 L.Ed.2d 440 (1964).[3] We read Colorado River and San Carlos Apache Tribe to counsel abstention in the interest of "wise judicial administration," despite that obligation, in the majority of water rights adjudications.[4]
 
 
 22
 The Court, however, has emphasized that its decision in Colorado River was not intended to preclude all adjudication in federal court of water rights arising under federal law. See San Carlos Apache Tribe, --- U.S. at ----, 103 S.Ct. at 3215. The Court recognized in Colorado River that the circumstances justifying dismissal of a federal suit for reasons of wise judicial administration "are considerably more limited than the circumstances appropriate for abstention." 424 U.S. at 818, 96 S.Ct. at ----.[5] The Court concluded: "No one factor is necessarily determinative; a carefully considered judgment taking into account both the obligation to exercise jurisdiction and the combination of factors counselling against that exercise is required." Id. at 818-19, 96 S.Ct. at 1247; accord Moses H. Cone Memorial Hospital v. Mercury Construction, --- U.S. ----, 103 S.Ct. 927 at 937, 74 L.Ed.2d 765. In San Carlos Apache Tribe, the Court's analysis emphasized the importance, in making this judgment, of avoiding "the possibility of duplicative litigation, tension and controversy between federal and state forums, hurried and pressured decisionmaking, and confusion over the disposition of property rights." Slip op. at 22. With these policies in mind, we turn to a review of the district court's "carefully considered judgment" in light of the facts presented to the court.
 
 B. Standard of Review
 
 23
 Our review is limited to a determination of whether the district court abused its discretion in proceeding to decide rather than dismiss this case.[6] In Will v. Calvert Fire Insurance Co., 437 U.S. 655, 664, 98 S.Ct. 2552, 2558, 57 L.Ed.2d 504 (1978), the Supreme Court stated that the decision to dismiss for reasons of wise judicial administration is one "largely committed to the discretion of the district court." See also Moses H. Cone Memorial Hospital v. Mercury Construction, 103 S.Ct. at 938; Cf. Brillhart v. Excess Insurance Co. of America, 316 U.S. 491, 495, 62 S.Ct. 1173, 1175-76, 86 L.Ed. 1620 (1942) (decision whether to abstain from exercising federal jurisdiction in light of pending state proceeding is committed to district court's discretion). In the present case, therefore, we will not set aside the district court's decision to exercise its jurisdiction unless we have a definite and firm conviction that the district court committed a clear error of judgment in concluding that exceptional circumstances requiring dismissal were not presented.[7] Anderson v. Air West, Inc., 542 F.2d 522, 524 (9th Cir.1976). Accord, Davis v. Fendler, 650 F.2d 1154, 1161 (9th Cir.1981); United States v. Sumitomo Marine & Fire Insurance Co., 617 F.2d 1365, 1369 (9th Cir.1980). We conclude that the district court did not abuse its discretion by choosing to determine the federal law priorities among water rights in this suit.
 
 C. Analysis of the District Court Decision
 
 24
 The state of Oregon and the individual defendants argue that the district court's exercise of jurisdiction fragments the adjudication of water rights in the Williamson River, contrary to the policy of the McCarran Amendment. The United States and the Tribe argue that the district court decision addresses a discrete water rights issue in a context that does not fragment the state general stream adjudication. They argue further that the district court judgment easily can be integrated into the state proceeding with no loss of efficiency.
 
 
 25
 Because of the posture in which this case has reached us, and because the chief goal of abstention under the Colorado River doctrine is the conservation of state and federal judicial resources, see San Carlos Apache Tribe, --- U.S. at ----, 103 S.Ct. at 3215, we hold that, on the facts of this case, the district court did not abuse its discretion by proceeding to decide, rather than dismiss, the federal law questions presented to it by the United States' suit. Indeed, were we to rule otherwise, and erase the district court's careful and time-consuming consideration of the federal water rights questions presented by this suit, thereby necessitating relitigation of the same issues in state court, we would, in effect, "throw the baby out with the bath" and create precisely the duplication and waste of judicial effort that Colorado River abstention and the McCarran Amendment are designed to avoid.
 
 
 26
 The Supreme Court stated in San Carlos Apache Tribe that:
 
 
 27
 Colorado River, of course, does not require that a federal water suit must always be dismissed or stayed in deference to a concurrent and adequate comprehensive state adjudication. Certainly, the federal courts need not defer to the state proceedings if the state courts expressly agree to stay their own consideration of the issues raised in the federal action pending disposition of that action. Moreover, it may be in a particular case that, at the time a motion to dismiss is filed, the federal suit at issue is well enough along that its dismissal would itself constitute a waste of judicial resources and an invitation to duplicative effort. See Colorado River, 424 U.S. at 820 [96 S.Ct. at 1247-1248]; Moses H. Cone Hospital, 460 U.S. at ---- [103 S.Ct. at 937]. Finally, we do not deny that, in a case in which the arguments for and against deference to a state adjudication were otherwise closely matched, the fact that a federal suit was brought by Indians on their own behalf and sought only to adjudicate Indian rights should be figured into the balance.
 
 
 28
 --- U.S. at ----, 103 S.Ct. at 3215 (emphasis added). In its present posture, this case, in our view, presents the kind of circumstances recognized by the Supreme Court as features of a particular suit that tip the balance against dismissal of a federal adjudication of Indian water rights even in the face of a contemporaneous but nascent state proceeding.
 
 
 29
 1. "Stay" of State Proceedings.
 
 
 30
 At the time the United States filed this action in the district court in September of 1975 there was no contemporaneous state proceeding of any kind to adjudicate water rights in the upper Williamson River watershed. Some months after the United States filed its suit in federal court, however, the Oregon State Water Resources Director issued a notice announcing that on Sept. 1, 1976, he would "begin an investigation of the flow and use of waters of the Klamath River and its tributaries ...." Under the Oregon scheme for adjudicating water rights, such a notice of investigation is one of the prerequisites to a state court determination of water rights. In addition, the Water Resources Director, after investigation, must decide that the "facts and conditions justify" making a determination of water rights. See Or.Rev.Stat. 539.020 (1981). At the time the district court ruled on defendants' motion to dismiss the federal suit, none of the preliminary steps in the Oregon adjudication had been completed.[8]
 
 
 31
 Of equal or greater importance to our decision in this case, however, is the fact that even at this time, some seven years after the Oregon Water Resources Director issued his notice of investigation, the state determination of water rights in the Klamath Basin has not proceeded beyond administrative investigation. Indeed, the information-gathering stage of the procedure is not yet complete. In effect, the state proceeding has been stayed during the pendency of this federal suit. See San Carlos Apache Tribe of Arizona at ----, 103 S.Ct. at 3215.[9]
 
 
 32
 2. Duplication and Waste of Judicial Resources That Would be Occasioned by Dismissal of the Federal Suit.
 
 
 33
 As the Supreme Court in San Carlos Apache Tribe warned, "in a particular case ... the federal suit at issue [may be] well enough along that its dismissal would itself constitute a waste of judicial resources and an invitation to duplicative effort." At ----, 103 S.Ct. at 3215.[10] It is our opinion that this case presents precisely such a situation. First, we note that the district court carefully tailored its exercise of jurisdiction to decide only the priority among water rights created under federal law. See infra Section II(C)(1)(c); see also Moses H. Cone Memorial Hospital v. Mercury Construction, 103 S.Ct. at 941. Second, the contemporaneous state proceeding for adjudicating water rights was, and still is, nascent. Finally, the district court has taken evidence, heard extensive argument from all of the parties, and developed a multi-volumed record on which to base its decision of the water rights questions presented by this case. Both the individual defendants as well as the intervenor, State of Oregon, have been offered, and have taken, a full opportunity to participate in all aspects of this litigation. The district court's determination of water rights is more than "well enough along," it is complete. Given this factual setting, it is clear to us that neither the policies of the McCarran Amendment, nor the interest of wise judicial administration would be served by a decision from this court reversing and vacating the district court's judgment without reaching the merits. See San Carlos Apache Tribe, at ----, 103 S.Ct. at 3214.
 
 
 34
 3. The District Court's Adjudication of Indian Water Rights.
 
 
 35
 In its Pretrial Order, the district court carefully outlined the issues it would decide and those it would leave to subsequent state adjudication. The court limited its determination to ordering the priority among reserved water rights arising under federal law. The district court explicitly anticipated that "[a]ctual quantification of the [reserved] rights to use of the waters of the Williamson River and its tributaries within the [federal] litigation area will be left for judicial determination, consistent with the decree in this action, by the State of Oregon under the provisions of [the McCarran Amendment]."
 
 
 36
 In so limiting its exercise of jurisdiction, the district court avoided passing on questions of state water law and indeed ruled only on those questions involving application of the federal Indian law doctrine of reserved water rights. Far from improperly intruding on the role of the state court, we find that in exercising federal jurisdiction in this fashion the district court coordinated its adjudication of water rights with adjudication by the state court so as to allow each forum to consider those issues most appropriate to its expertise.[11]
 
 
 37
 In addition, while this case was not filed initially by the Klamath Tribe under the provisions of 28 U.S.C. Sec. 1362, the Tribe intervened on its own behalf shortly after the United States filed suit. Such intervention was quite proper since, had the Tribe not intervened, the United States could have been in the difficult position of representing competing interests in the same law suit. See infra Section III(C); see also Nevada v. United States, --- U.S. ----, 103 S.Ct. 2906, 2917, 77 L.Ed.2d 509 (1983) (recognizing problems faced by Government when it is given the duty to represent competing interests). Once the Tribe intervened, in light of the district court's limited exercise of jurisdiction, the case presented, for all practical purposes, a suit to adjudicate Indian water rights on behalf of an Indian Tribe. See San Carlos Apache Tribe, --- U.S. at ----, 103 S.Ct. at 3214.
 
 
 38
 4. Summary.
 
 
 39
 The district court limited its exercise of jurisdiction to a determination of the priority among federal water rights on lands roughly within the boundaries of the former Klamath Indian Reservation. It did not undertake a general stream adjudication. Proceeding in this fashion, it avoided the duplication of any state water rights adjudication and, we think, the pitfalls of piecemeal determination of water rights. In fact, the district court considered those factors identified as "secondary" in Colorado River, see 424 U.S. at 820, 96 S.Ct. at 1247-48, and found, correctly we think, that they did not counsel dismissal.[12] Under these circumstances we cannot say that the district court abused its discretion. Because the district court had statutory jurisdiction to act as it did, and because we believe it would be an exercise in unwise and wasteful judicial administration inconsistent with the Supreme Court's decision in San Carlos Apache Tribe to vacate and cast aside the district court's carefully considered judgment in these matters, we proceed to a review of the merits of the district court's decision.
 
 III
 WATER RIGHTS
 
 40
 The district court declared reserved water rights within the litigation area to the Klamath Tribe, the Government, individual Indians, and non-Indian successors to Indian land owners. Each of the parties appeals from a different aspect of the district court's judgment. We address, first, the State and individual defendants' appeal from the court's declaration of water rights to the Tribe.
 
 
 41
 A. A Reservation of Water to Accompany the Tribe's Treaty Right to Hunt, Fish, and Gather.
 
 
 42
 Article I of the 1864 treaty with the Klamath Tribe reserved to the Tribe the exclusive right to hunt, fish, and gather on its reservation. 16 Stat. 707, 708; Kimball I, 493 F.2d at 566. This right survived the Klamath Termination Act, 25 U.S.C. Secs. 564-564w (1976). See Kimball v. Callahan, 590 F.2d 768, 775 (9th Cir.), cert. denied, 444 U.S. 826, 100 S.Ct. 49, 62 L.Ed.2d 33 (1979) (Kimball II ); Kimball I, 493 F.2d at 569. The issue presented for decision in this case is whether, as the district court held, these hunting and fishing rights carry with them an implied reservation of water rights.
 
 
 43
 1. Reservation of Water in the 1864 Treaty.
 
 
 44
 In Winters v. United States, 207 U.S. 564, 576-77, 28 S.Ct. 207, 211-12, 52 L.Ed. 340 (1908), the Supreme Court held that the treaty creating the Fort Belknap Indian Reservation contained an implied reservation of water to irrigate the arid Indian lands. More recently, in Cappaert v. United States, 426 U.S. 128, 96 S.Ct. 2062, 48 L.Ed.2d 523 (1976), and United States v. New Mexico, 438 U.S. 696, 98 S.Ct. 3012, 57 L.Ed.2d 1052 (1978), the Supreme Court addressed the scope and nature of Winters doctrine water rights on federal lands other than Indian reservations. In Cappaert, the Court upheld a lower court determination that, in setting aside the Devil's Hole National Monument, the United States had reserved a quantity of water sufficient to meet the purposes for which the Monument was established. The Court stated:
 
 
 45
 In determining whether there is a federally reserved water right implicit in a federal reservation of public land, the issue is whether the Government intended to reserve unappropriated and thus available water. Intent is inferred if the previously unappropriated waters are necessary to accomplish the purposes for which the reservation was created.
 
 
 46
 426 U.S. at 139, 96 S.Ct. at 2070. In New Mexico, the Supreme Court clarified the scope of the reserved water rights doctrine in the course of determining whether the United States had reserved water for use on the Gila National Forest in New Mexico. The Court indicated that water may be reserved under the Winters doctrine only for the primary purposes of a federal reservation. 438 U.S. at 702, 98 S.Ct. at 3015. Hence, even though the Supreme Court agreed that hunting, fishing, and recreation are among the purposes for which the National Forest System is maintained, it determined that these purposes are secondary to the purposes of "securing favorable conditions of water flows," and furnishing "a continuous supply of timber." 16 U.S.C. Sec. 475 (1976), quoted in United States v. New Mexico, 438 U.S. at 706-07, 98 S.Ct. at 3017. Accordingly, only the latter purposes carried with them an implied reservation of water rights. 438 U.S. at 713-15, 98 S.Ct. at 3020-22. New Mexico and Cappaert, while not directly applicable to Winters doctrine rights on Indian reservations, see F. Cohen, Handbook of Federal Indian Law 581-85 (1982 ed.),[13] establish several useful guidelines. First, water rights may be implied only "[w]here water is necessary to fulfill the very purposes for which a federal reservation was created," and not where it is merely "valuable for a secondary use of the reservation." New Mexico, 438 U.S. at 702, 98 S.Ct. at 3014. Second, the scope of the implied right is circumscribed by the necessity that calls for its creation. The doctrine "reserves only that amount of water necessary to fulfill the purpose of the reservation, no more." Cappaert, 426 U.S. at 141, 96 S.Ct. at 2071.
 
 
 47
 The question, therefore, is whether securing to the Indians the right to hunt, fish, and gather was a primary purpose of the Klamath Reservation. Resolution of this question, in turn, depends on an analysis of the intent of the parties to the 1864 Klamath Treaty as reflected in its text and the surrounding circumstances. See Washington v. Fishing Vessel Ass'n, 443 U.S. 658, 675-76, 99 S.Ct. 3055, 3069-70, 61 L.Ed.2d 823 (1979); United States v. Winters, 207 U.S. at 575-76, 28 S.Ct. at 211. The State and individual appellants argue that the intent of the 1864 Treaty was to convert the Indians to an agricultural way of life. The Government and the Tribe argue that an equally important purpose of the treaty was to guarantee continuity of the Indians' hunting and gathering lifestyle. Under the guidelines established in Cappaert and New Mexico, we find that both objectives qualify as primary purposes of the 1864 Treaty and accompanying reservation of land.
 
 
 48
 Article I of the Klamath Treaty expressly provides that the Tribe will have exclusive on-reservation fishing and gathering rights. 16 Stat. 708. This language has been interpreted to include, in addition, a grant of exclusive hunting and trapping rights. Kimball I, 493 F.2d at 566; Klamath & Modoc Tribes v. Maison, 139 F.Supp. 634, 637 (D.Or.1956), aff'd in part, rev'd in part, 338 F.2d 620 (9th Cir.1964). As this court noted in Kimball I,
 
 
 49
 The specific treaty provision reserving the Klamaths' exclusive right to fish could prompt the argument that their treaty excludes the right to hunt. However, in light of the highly significant role that hunting and trapping played (and continue to play) in the lives of the Klamaths, it seems unlikely that they would have knowingly relinquished these rights at the time they entered into the treaty.
 
 
 50
 493 F.2d at 566 (footnote omitted).[14] In view of the historical importance of hunting and fishing, and the language of Article I of the 1864 Treaty, we find that one of the "very purposes" of establishing the Klamath Reservation was to secure to the Tribe a continuation of its traditional hunting and fishing lifestyle. This was at the forefront of the Tribe's concerns in negotiating the treaty and was recognized as important by the United States as well.[15]
 
 
 51
 At the same time, as the State and individual defendants argue, Articles II through V of the 1864 Treaty evince a purpose to convert the Klamath Tribe to an agricultural way of life. Article II provides that monies paid to the Tribe in consideration for the land ceded by the treaty "shall be expended ... to promote the well-being of the Indians, advance them in civilization, and especially agriculture, and to secure their moral improvement and education." 16 Stat. 708 (emphasis added). A similar focus on agriculture is reflected in the language of Articles III, IV and V. Id. at 708-09. It is apparent that a second essential purpose in setting aside the Klamath Reservation, recognized by both the Tribe and the Government, was to encourage the Indians to take up farming.
 
 
 52
 Neither Cappaert nor New Mexico requires us to choose between these activities or to identify a single essential purpose which the parties to the 1864 Treaty intended the Klamath Reservation to serve. See supra note 11. In fact, in Colville Confederated Tribes v. Walton, 647 F.2d 42 (9th Cir.), cert. denied, 454 U.S. 1092, 102 S.Ct. 657, 70 L.Ed.2d 630 (1981), this court found that provision of a "homeland for the Indians to maintain their agrarian society," id. at 47, as well as "preservation of the tribe's access to fishing grounds," id. at 48, were dual purposes behind establishment of the Colville Reservation. Consequently the court found an implied reservation of water to support both of these activities. President Grant established the Colville Reservation in a one-paragraph Executive Order that stated only that the land would be "set apart as a reservation for said Indians."[16] Thus the court in Colville discovered the purposes of the reservation and implied water rights from a much less explicit text than that provided by the 1864 Klamath Treaty, Articles I through V. See Colville, 647 F.2d at 47 n. 8. We therefore have no difficulty in upholding the district court's finding that at the time the Klamath Reservation was established, the Government and the Tribe intended to reserve a quantity of the water flowing through the reservation not only for the purpose of supporting Klamath agriculture, but also for the purpose of maintaining the Tribe's treaty right to hunt and fish on reservation lands.
 
 
 53
 A water right to support game and fish adequate to the needs of Indian hunters and fishers is not a right recognized as a part of the common law doctrine of prior appropriation followed in Oregon.[17] Indeed, one of the standard requirements of the prior appropriation doctrine is that some diversion of the natural flow of a stream is necessary to effect a valid appropriation.[18] But diversion of water is not required to support the fish and game that the Klamath Tribe take in exercise of their treaty rights. Thus the right to water reserved to further the Tribe's hunting and fishing purposes is unusual in that it is basically non-consumptive. See 1 R. Clark, Waters and Water Law Sec. 55.2, at 578-81 (1967). The holder of such a right is not entitled to withdraw water from the stream for agricultural, industrial, or other consumptive uses (absent independent consumptive rights). Rather, the entitlement consists of the right to prevent other appropriators from depleting the streams waters below a protected level in any area where the non-consumptive right applies. See Cappaert, 426 U.S. at 143, 96 S.Ct. at 2072 (characterizing right in similar manner). In this respect, the water right reserved for the Tribe to hunt and fish has no corollary in the common law of prior appropriations.[19]
 
 
 54
 2. Effect of the Klamath Termination Act on the Tribe's Hunting and Fishing Water Rights.
 
 
 55
 In 1954, Congress terminated federal supervision of the Klamath Tribe. 25 U.S.C. Secs. 564-564w (1976). The state and individual appellants now argue that the Termination Act also abrogated any water rights reserved by the 1864 Treaty to accompany the Tribe's right to hunt and fish. Appellants contend that when federal supervision was terminated, former reservation lands were sold at full market value without limitations on use. See Act of Aug. 23, 1958, Pub.L. No. 85-371, 72 Stat. 816, 817 (1958 amendments to Termination Act). They conclude that recognition of a reserved water right to sustain the Tribe's hunting and fishing rights would impose a servitude or limitation on the use of former reservation lands in contravention of the Termination Act policy of unencumbered sale.
 
 
 56
 Appellants' argument, however, overlooks the substantive language of the Termination Act,[20] the canons of construction for legislation affecting Indian Tribes, and the implications of our decision in Kimball I. Section 564m(a) of the Termination Act provides, "[n]othing in sections 564-564w of this title shall abrogate any water rights of the tribe and its members." 25 U.S.C. Sec. 564m(a) (1976); see Menominee Tribe v. United States, 391 U.S. 404, 416 n. 7, 88 S.Ct. 1705, 1712-13 n. 7, 20 L.Ed.2d 697 (1968) (Stewart, J., dissenting). This provision admits no exception, nor can it be read to exclude reserved water rights. Congress presumably was aware of the importance of such rights to Indian tribes at the time it drafted section 564m of the Klamath Termination Act.[21] A conclusion that the Termination Act ended the Klamath's hunting and fishing water rights would impute to Congress the intention to abrogate rights guaranteed to the Tribe in the 1864 Treaty. As the Supreme Court noted in Menominee Tribe v. United States, 391 U.S. 404, 413, 88 S.Ct. 1705, 1711, 20 L.Ed.2d 697 (1968), it is "difficult to believe that Congress, without explicit statement, would subject the United States to a claim for compensation by destroying property rights conferred by treaty." See Swim v. Bergland, 696 F.2d 712, 717 (9th Cir.1983); United States v. State of Washington, 520 F.2d 676, 693 (9th Cir.1975) ("[o]nce a tribe is determined to be a party to a treaty, its rights under that treaty may be lost only by unequivocal action of Congress."), cert. denied, 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976); Comment, The Water Rights of Klamath Indian Allottees, 59 Ore.L.Rev. 299, 312-17 (1980). Because Congress in section 564m of the Termination Act explicitly protected tribal water rights and nowhere in the Act explicitly denied them, we can only conclude that such rights survived termination.
 
 
 57
 Our conclusion is confirmed by this court's prior decision in Kimball I. There we found that the Tribe's hunting and fishing rights, protected by Article I of the 1864 Treaty, survived passage of the Termination Act. 493 F.2d at 568-69; see Kimball II, 590 F.2d at 775. Were we to deny today reservation of sufficient water to protect the rights recognized in Kimball I and II, we would effectively nullify the substance of those decisions. In sum, we agree with the district court that the water rights reserved to the Klamath Tribe by Treaty in 1864 were not abrogated by enactment of the Klamath Termination Act in 1954.
 
 
 58
 3. Priority of the Water Right Reserved to Accompany the Tribe's Treaty Right to Hunt and Fish.
 
 
 59
 The district court found that the Tribe's water right accompanying its right to hunt and fish carried a priority date for appropriation of time immemorial. United States v. Adair, 478 F.Supp. at 350. The State and individual appellants argue that an implied reservation of water cannot have a priority date earlier than establishment of the reservation. The Government and the Tribe argue that a pre-reservation priority date is appropriate for tribal water uses that pre-date establishment of the reservation. We have been unable to find any decisions that squarely address this issue. We therefore begin our analysis by turning to well-established principles of Indian treaty interpretation and Indian property rights for guidance.
 
 
 60
 Foremost among these is the principle that "the treaty is not a grant of rights to the Indians, but a grant of rights from them--a reservation of those not granted." United States v. Winans, 198 U.S. 371, 381, 25 S.Ct. 662, 664, 49 L.Ed. 1089 (1905); accord Washington v. Fishing Vessel Ass'n, 443 U.S. 658, 678, 680-81, 99 S.Ct. 3055, 3070-71, 3071-72, 61 L.Ed.2d 823 (1979); United States v. Wheeler, 435 U.S. 313, 327 n. 24, 98 S.Ct. 1079, 1088 n. 24, 55 L.Ed.2d 303 (1978). Further, Indian treaties should be construed as the tribes would have understood them. Choctaw Nation v. Oklahoma, 397 U.S. 620, 631, 90 S.Ct. 1328, 1334-35, 25 L.Ed.2d 615 (1970); United States v. Top Sky, 547 F.2d 486, 487 (9th Cir.1976); Kimball I, 493 F.2d at 566 & n. 7 (treaty construed as Indians would have understood it given practices and customs of tribe at time treaty was negotiated); see also Worcester v. Georgia, 31 U.S. (6 Pet.) 515, 551-54, 8 L.Ed. 483 (1832). And any ambiguity in a treaty must be resolved in favor of the Indians. Oliphant v. Suquamish Indian Tribe, 435 U.S. 191, 208 n. 17, 98 S.Ct. 1011, 1020 n. 17, 55 L.Ed.2d 209 (1978); Bryan v. Itasca County, 426 U.S. 373, 392, 96 S.Ct. 2102, 2112-13, 48 L.Ed.2d 710 (1976); Confederated Salish & Kootenai Tribes v. Namen, 665 F.2d 951, 962 (9th Cir.), cert. denied, --- U.S. ----, 103 S.Ct. 314, 74 L.Ed.2d 291 (1982). A corollary of these principles, also recognized by the Supreme Court, is that when a tribe and the Government negotiate a treaty, the tribe retains all rights not expressly ceded to the Government in the treaty so long as the rights retained are consistent with the tribe's sovereign dependent status. See Oliphant v. Suquamish Indian Tribe, 435 U.S. at 208, 98 S.Ct. at 1020-21; United States v. Ahtanum Irrigation Dist., 236 F.2d 321, 326 (9th Cir.1956), cert. denied, 352 U.S. 988, 77 S.Ct. 386, 1 L.Ed.2d 367 (1957).
 
 
 61
 In 1864, at the time the Klamath entered into a treaty with the United States, the Tribe had lived in Central Oregon and Northern California for more than a thousand years. This ancestral homeland encompassed some 12 million acres. Within its domain, the Tribe used the waters that flowed over its land for domestic purposes and to support its hunting, fishing, and gathering lifestyle. This uninterrupted use and occupation of land and water created in the Tribe aboriginal or "Indian title" to all of its vast holdings. See United States v. Klamath and Modoc Tribes, 304 U.S. 119, 122-23, 58 S.Ct. 799, 801, 82 L.Ed. 1219 (1938); see also United States v. Santa Fe Pacific R. Co., 314 U.S. 339, 345, 62 S.Ct. 248, 251, 86 L.Ed. 260 (1941); Holden v. Joy, 84 U.S. (17 Wall.) 211, 244, 21 L.Ed. 523 (1872). See generally, Note, "Indian Title: The Rights of American Natives in Lands They Have Occupied Since Time Immemorial," 75 Colum.L.Rev. 655 (1975). Aboriginal title is "considered as sacred as the fee simple of the whites." Mitchel v. United States, 34 U.S. (9 Pet.) 711, 745, 9 L.Ed. 283 (1835); accord United States v. Santa Fe Pacific R. Co., 314 U.S. at 345, 62 S.Ct. at 251. The Supreme Court has specifically held that the Tribe had aboriginal title to timber on the Klamath Reservation. United States v. Klamath and Modoc Tribes, 304 U.S. 119, 122-23, 58 S.Ct. 799, 801, 82 L.Ed. 1219 (1938). The Tribe's title also included aboriginal hunting and fishing rights, see Sac & Fox Tribe of Mississippi in Iowa v. Licklider, 576 F.2d 145, 151 (8th Cir.), cert. denied, 439 U.S. 955, 99 S.Ct. 353, 58 L.Ed.2d 346 (1978), and by the same reasoning, an aboriginal right to the water used by the Tribe as it flowed through its homeland. Cf. United States v. Santa Fe Pacific R. Co., 314 U.S. at 344, 359, 62 S.Ct. at 257-58 (accounting ordered for rents, issues and profits derived from lands to which tribe held aboriginal title). Only the United States can extinguish such aboriginal title. United States v. Alcea Band of Tillamooks, 329 U.S. 40, 46, 67 S.Ct. 167, 170, 91 L.Ed. 29 (1946). Until the latter part of the nineteenth century, aboriginal title was most often extinguished by a treaty between the affected tribe and the United States. See C. Wilkinson & J. Volkman, Judicial Review of Indian Treaty Abrogation: "As Long as Water Flows, or Grass Grows Upon the Earth"--How Long a Time Is That? 63 Calif.L.Rev. 601, 608-12 (1975).
 
 
 62
 With this background in mind, we examine the priority date attaching to the Klamath Tribe's reservation of water to support its hunting and fishing rights. In Article I of the 1864 Treaty the Tribe expressly ceded "all [its] right, title and claim" to most of its ancestral domain. 16 Stat. 707. In the same article, however, the Tribe reserved for its exclusive use and occupancy the lands that became the Klamath Reservation, the same lands that are the subject of the instant suit. 16 Stat. 708. There is no indication in the treaty, express or implied, that the Tribe intended to cede any of its interest in those lands it reserved for itself. See United States v. Winans, 198 U.S. at 381, 25 S.Ct. at 664; United States v. Ahtanum Irrigation Dist., 236 F.2d at 326. See also Bryan v. Itasca County, 426 U.S. at 392, 96 S.Ct. at 2112-13. Nor is it possible that the Tribe would have understood such a reservation of land to include a relinquishment of its right to use the water as it had always used it on the land it had reserved as a permanent home. See Choctaw Nation v. Oklahoma, 397 U.S. at 631, 90 S.Ct. at 1334-35; Kimball I, 493 F.2d at 566. Further, we find no language in the treaty to indicate that the United States intended or understood the agreement to diminish the Tribe's rights in that part of its aboriginal holding reserved for its permanent occupancy and use. Accordingly, we agree with the district court that within the 1864 Treaty is a recognition of the Tribe's aboriginal water rights and a confirmation to the Tribe of a continued water right to support its hunting and fishing lifestyle on the Klamath Reservation.
 
 
 63
 Such water rights necessarily carry a priority date of time immemorial. The rights were not created by the 1864 Treaty, rather, the treaty confirmed the continued existence of these rights. See Washington v. Fishing Vessel Ass'n, 443 U.S. at 678-81, 99 S.Ct. at 3070-72; State v. Coffee, 97 Idaho 905, 908, 556 P.2d 1185, 1188 (1976); see also Worcester v. Georgia, 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832); Johnson v. McIntosh, 21 U.S. (8 Wheat.) 543, 5 L.Ed. 681 (1823). See generally W. Veeder, Indian Prior and Paramount Rights to the Use of Water, 16 Rocky Mtn.Min.L.Inst. 631, 649-57 (1971). To assign the Tribe's hunting and fishing water rights the later, 1864, priority date argued for by the State and individual appellants would ignore one of the fundamental principles of prior appropriations law--that priority for a particular water right dates from the time of first use. See 5 R. Clark, Waters and Water Rights Secs. 410, 414.2 (1972). Furthermore, an 1864 priority date might limit the scope of the Tribe's hunting and fishing water rights by reduction for any pre-1864 appropriations of water. This could extinguish rights the Tribe held before 1864 and intended to reserve to itself thereafter. Thus, we are compelled to conclude that where, as here, a tribe shows its aboriginal use of water to support a hunting and fishing lifestyle, and then enters into a treaty with the United States that reserves this aboriginal water use, the water right thereby established retains a priority date of first or immemorial use.[22]
 
 
 64
 This does not mean, however, as the individual appellants argue, that the former Klamath Reservation will be subject to a "wilderness servitude" in favor of the Tribe. Apparently, appellants read the water rights decreed to the Tribe to require restoration of an 1864 level of water flow on former reservation lands now used by the Tribe to maintain traditional hunting and fishing lifestyles. We do not interpret the district court's decision so expansively.
 
 
 65
 In its opinion discussing the Tribe's hunting and fishing water rights, the district court stated "[t]he Indians are still entitled to as much water on the Reservation lands as they need to protect their hunting and fishing rights." 478 F.Supp. at 345. We interpret this statement to confirm to the Tribe the amount of water necessary to support its hunting and fishing rights as currently exercised to maintain the livelihood of Tribe members, not as these rights once were exercised by the Tribe in 1864. We find authority for such a construction of the Indians' rights in the Supreme Court's decision in Washington v. Fishing Vessel Ass'n, 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979). There, citing Arizona v. California, 373 U.S. 546, 83 S.Ct. 1468, 10 L.Ed.2d 542 (1963), a reserved water rights case, the court stated "that Indian treaty rights to a natural resource that once was thoroughly and exclusively exploited by the Indians secures so much as, but not more than, is necessary to provide the Indians with a livelihood--that is to say, a moderate living." 443 U.S. at 686, 99 S.Ct. at 3075. Implicit in this "moderate living" standard is the conclusion that Indian tribes are not generally entitled to the same level of exclusive use and exploitation of a natural resource that they enjoyed at the time they entered into the treaty reserving their interest in the resource, unless, of course, no lesser level will supply them with a moderate living. See Washington v. Fishing Vessel Ass'n, 443 U.S. at 686, 99 S.Ct. at 3074-75.[23] As limited by the "moderate living" standard enunciated in Fishing Vessel, we affirm the district court's decision that the Klamath Tribe is entitled to a reservation of water, with a priority date of immemorial use, sufficient to support exercise of treaty hunting and fishing rights.[24]
 
 
 66
 B. Water Rights of Successors-in-Interest to Klamath Indian Allottees.
 
 
 67
 The district court declared water rights to both Indian and non-Indian successors-in-interest to Klamath Indian allottees. As to the Indian owners of allotted lands, appellants argue that the terms of the Klamath Termination Act subject any water rights of such allottees to state water law. See 25 U.S.C. Sec. 564m (1976). The Tribe, by cross-appeal, also challenges the district court's declaration of water rights to non-Indian successors-in-interest to lands previously allotted to members of the Tribe. We affirm the district court's determination in all respects on these issues.
 
 
 68
 1. Indian Successors to Allotted Reservation Lands.
 
 
 69
 With regard to individual Indian landowners, the district court stated:
 
 
 70
 The individual Indian landowners are entitled to use water essential to their agricultural needs when those needs arise. This right, however, is subject to the superior right of other Indians to use the water for the preservation of hunting and fishing on Reservation lands.
 
 
 71
 * * *
 
 
 72
 The priority date of Indian rights to water for irrigation and domestic purposes is 1864.
 
 
 73
 478 F.Supp. at 346, 350. The scope of Indian irrigation rights is well settled. See Arizona v. California, 373 U.S. 546, 599-601, 83 S.Ct. 1468, 1497-98, 10 L.Ed.2d 542 (1963). It is a right to sufficient water to "irrigate all the practicably irrigable acreage on the reservation." Id. at 600, 83 S.Ct. at 1498. Individual Indian allottees have a right to use a portion of this reserved water. United States v. Powers, 305 U.S. 527, 531, 59 S.Ct. 344, 346, 83 L.Ed. 330 (1939). Moreover, the full measure of this right need not be exercised immediately. As with rights reserved to the Tribe, water may be used by Indian allottees for present and future irrigation needs.[25] See Colville Confederated Tribe v. Walton, 647 F.2d at 51; United States v. Ahtanum Irrigation District, 236 F.2d 321, 342 (9th Cir.1956).
 
 
 74
 This right is limited here only by section 14 of the Klamath Termination Act, 25 U.S.C. Sec. 564m (1976). This section provides, first, that "[n]othing in [The Termination Act] shall abrogate any water rights of the tribe and its members," and second, that "the laws of the State of Oregon with respect to abandonment of water rights by non-use shall not apply to the tribe and its members until fifteen years after the date of the proclamation [of termination]." Id. The State and individual appellants argue that the second part of section 564m was meant to apply all Oregon water law, except that respecting abandonment of water rights by non-use, to the Tribe immediately upon the proclamation of termination.[26]
 
 
 75
 We cannot accept this position. To do so would undermine the explicit command in the first part of section 564m that termination does not abrogate Klamath tribal water rights. For example, under appellants' interpretation of section 564m, after the proclamation in 1961 any water rights of the Tribe not perfected under the Oregon system, whether or not these rights were in actual use, would be lost to the Tribe. See, e.g., Or.Rev.Stat. Secs. 537.211-537.270, 537.410-537.450 (1981). Moreover, if all Oregon water law except the non-use provisions were applied to the Tribe in 1961, the Tribe's ability to appropriate its full measure of reserved water rights would be cut off because Oregon water law, unlike the law of federal reserved rights, has no provision to protect reserved but unappropriated waters.
 
 
 76
 In order to effectuate the Termination Act's explicit command that Klamath water rights survive unimpaired, we must interpret the second part of section 564m to mean that starting in 1976, fifteen years after the proclamation of termination in 1961, reserved water actually appropriated for use by members of the Tribe on allotments, could be lost under Oregon laws "with respect to abandonment of water rights by non-use." However, no other provision of Oregon water law that might preclude appropriation of the full measure of Klamath reserved water rights may be applied to the Tribe or its members consistently with the unequivocal language of protection in the first sentence of section 564m.[27] To hold otherwise would sanction destruction of treaty rights in the absence of the required express Congressional approval. See Menominee Tribe v. United States, 391 U.S. 404, 413, 88 S.Ct. 1705, 1711, 20 L.Ed.2d 697 (1968) (abrogation of treaty rights not lightly imputed to Congress in the absence of explicit statement); accord, Kimball I, 493 F.2d at 569; United States v. State of Washington, 520 F.2d 676, 693 (9th Cir.1975), cert. denied, 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976). See generally Comment, The Water Rights of Klamath Indian Allottees, 59 Ore.L.Rev. 299, 312-17 (1980).
 
 
 77
 2. Non-Indian Successors to Allotted Reservation Lands.
 
 The district court held that:
 
 78
 a non-Indian successor to an Indian allottee acquires an appurtenant right to water for the actual acreage under irrigation when he gets title from his Indian predecessor. The priority date of that right is 1864.
 
 
 79
 The non-Indian also acquires a right, with an 1864 priority date, to water for additional acreage which he, with reasonable diligence, may place under irrigation.
 
 
 80
 478 F.Supp. at 349. The sole claim raised by the Tribe in its cross-appeal is to this aspect of the district court's decision.
 
 
 81
 The claim, however, is foreclosed by our recent decision in Colville Confederated Tribes v. Walton, 647 F.2d at 42. There we held that "[t]he full quantity of water available to the Indian allottee thus may be conveyed to the non-Indian purchaser." Id. at 51. The limitations on this transfer, recognized in Colville are, first, that the non-Indian successor's right to water is "limited by the number of irrigable acres [of former reservation lands that] he owns," id., and second, that the non-Indian purchaser may lose the right to that quantity of water through non-use. Thus, citing the district court's opinion in the instant case, in Colville, we limited a non-Indian successor to lands allotted to a member of the Colville Tribe to the amount of water used by the Indian predecessor plus additional water that "he or she appropriates with reasonable diligence after the passage of title." Id; see United States v. Hibner, 27 F.2d 909 (D.Idaho 1928).[28] Accordingly, the district court's decision on this point is affirmed.
 
 
 82
 C. The United States' Water Rights in Former Klamath Reservation Lands.
 
 
 83
 The district court did not determine the scope or priority of the Government's water rights on land it now owns within the former Klamath Reservation,[29] although the Government's claims had been developed fully in the record before the court. These Government lands constitute approximately 70% of the former reservation and include the Klamath National Wildlife Refuge and large portions of the Winema National Forest. Rather than determine the Government's water rights in these lands, however, the district court concluded:
 
 
 84
 The protection of the Indians' hunting and fishing rights requires a natural streamflow through both the Marsh and forest lands on the former Reservation. The Indians' use of their rights to that streamflow will ensure that enough water flows through the Refuge and through the Winema National Forest within the former Reservation to fulfill the Government's purposes for those lands.
 
 
 85
 It is therefore unnecessary to issue a separate declaration of Government water rights for the Refuge and forests of the Reservation.
 
 
 86
 478 F.Supp. at 347. The Government, in its brief, states that "while the court below assumed that fulfillment of the Indians' Article I rights will also satisfy all of the rights of the United States, this thesis was not asserted, much less established, before the district court." We agree.
 
 
 87
 The most significant water rights still held by the Klamath Tribe on former reservation lands are those that accompany their treaty hunting and fishing rights. See supra Section III(A)(1).[30] These rights are essentially nonconsumptive in nature. Id. Thus, to the extent that the United States now owns former reservation lands which may be benefited by a compatible nonconsumptive use of water, the Government may participate in the enjoyment of the Klamath's hunting and fishing water rights. See United States v. Alpine Land & Reservoir Co., 697 F.2d 851, 859-60 (9th Cir.) (discussing water right for recreation), cert. denied, sub nom. Pyramid Lake Paiute Tribe of Indians v. Truckee-Carson Irrigation District, --- U.S. ----, 104 S.Ct. 193, 78 L.Ed.2d 170 (1983).
 
 
 88
 We must point out, however, that the Government has no ownership interest in, or right to control the use of, the Klamath Tribe's hunting and fishing water rights. The hunting and fishing rights from which these water rights arise by necessary implication were reserved by the Tribe in the 1864 treaty with the United States. See supra section III(A). The hunting and fishing rights themselves belong to the Tribe and may not be transferred to a third party. See generally Montana v. United States, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981). Because the Klamath Tribe's treaty right to hunt and fish is not transferable, it follows that no subsequent transferee may acquire that right of use or the reserved water necessary to fulfill that use.[31]
 
 
 89
 It follows that the district court erred in concluding that it was unnecessary to determine the scope and priority of the Government's water rights in former reservation lands. Because, on the record below, these rights may be defined as a matter of federal law, we have concluded that a remand on this issue is unnecessary. See Turf Paradise, Inc. v. Arizona Downs, 670 F.2d 813, 821 (9th Cir.), cert. denied, 456 U.S. 1011, 102 S.Ct. 2308, 73 L.Ed.2d 1308 (1982).
 
 
 90
 The Government claims that its water rights in former reservation land derive from two sources. The first is its acquisition of land, together with appurtenant water rights, from Indian allottees. The second is its implied reservation of water rights under the Winters doctrine. We conclude that the Government is entitled to claim rights as successor to Indian allottees. We further conclude that the Government may not claim further reserved water rights with an 1864 priority date. The Government has not asserted, and we thus do not decide, whether additional rights could have been reserved by implication pursuant to the Klamath Termination Act.
 
 
 91
 1. Appurtenant Water Rights.
 
 
 92
 The Government acquired the former reservation lands by purchasing land from Indian allottees and condemning land held in trust for Indian allottees. See supra Section I. It is therefore entitled to the same appurtenant water rights as other non-Indian successors, subject to the limitations articulated in Colville. The priority date of these rights is 1864.
 
 
 93
 2. Reserved Water Rights.
 
 
 94
 The Government has argued that it reserved water rights in 1864 for Indian reservation purposes and converted those rights to forest and wildlife preserve purposes upon acquisition of beneficial interest in the land. We disagree.
 
 
 95
 The purpose of a federal reservation of land defines the scope and nature of impliedly reserved water rights. See United States v. New Mexico, 438 U.S. at 700, 98 S.Ct. at 3014. Because the reserved rights doctrine is an exception to Congress's explicit deference to state water law in other areas, see id. at 715, 98 S.Ct. at 3021, the Supreme Court has emphasized the importance of the limitation of such rights to only so much water as is essential to accomplish the purpose for which the land was reserved. Id. at 700, 98 S.Ct. at 3014. We conclude that it would be inconsistent with the principles expressed in United States v. New Mexico to hold that the Government may "tack" a currently claimed Winters right to a prior one by asserting that it has merely changed the purpose of its previously reserved water right.
 
 
 96
 There is another reason why we must reject the Government's assertion that, by virtue of the water rights impliedly reserved in 1864, the Government owns a reserved right to water for forest and wildlife preserve purposes with an 1864 priority date. The government has claimed that the irrigation rights reserved in 1864 passed to it upon acquisition of former reservation land, and we have agreed. We have also held that the hunting and fishing rights reserved in 1864 are currently held by the Tribe. Thus, all water rights reserved in 1864 on land the Government now owns are accounted for. The Government cannot claim both that the reserved rights passed to Indian allottees and their successors and that the rights were retained by the United States.
 
 
 97
 The Government has not argued that Congress intended to reserve water rights for forest and wildlife purposes in enacting the Klamath Termination Act, and we express no opinion on the merits of such a claim. It is possible that, after the water rights to which we have held the Government to be entitled have been quantified, the Government will find that it has insufficient water to use former Klamath Reservation lands for the purposes Congress has designated. Congress, however, has the power to acquire the additional water the Government may need by explicitly exercising its constitutional authority under article IV, section 3. See U.S. Const. art. IV, Sec. 3.
 
 
 98
 3. Klamath River Basin Compact.
 
 
 99
 Finally, we address the contention of the State of Oregon and the individual defendants that the Government's acquisition of appurtenant water rights in former reservation land is limited by the Klamath River Basin Compact, Pub.L. No. 85-222, 71 Stat. 497 (1957). The Compact explicitly preserves Indian water rights, including irrigation rights that are more fully exercised after the Compact's ratification, from diminution. See Art. X, 71 Stat. at 505. The Compact further preserves all federal rights, powers and jurisdiction except as explicitly conceded. See Art. XI, id. We conclude that Congress did not intend to make the terms of the Compact control the government's acquisition of Indian irrigation rights or the Tribe's continued enjoyment of hunting and fishing rights. See Arizona v. California, 373 U.S. 546, 566, 83 S.Ct. 1468, 1480-81, 10 L.Ed.2d 542 (1963). These are the only water rights at issue here.
 
 IV
 CONCLUSION
 
 100
 After a careful review of the record in this case, we hold that the district court did not abuse its discretion in its exercise of jurisdiction to determine the scope and priority among the federal reserved water rights involved in this litigation. As to the district court's determination of these water rights issues, we affirm in all respects except the district court's decision not to declare separately the water rights of the United States on former reservation lands that it now owns. On this point, we modify the district court's judgment to incorporate the declaration of the Government's water rights within the former Klamath Reservation contained in Section III, part C of our opinion. As modified, the district court's opinion is AFFIRMED.
 
 
 
 [1]
 The "reef" is a geologic formation that constricts the flow of the Williamson River at the downstream end of the Klamath Marsh. The "reef" is located near the town of Kirk, Oregon. Except for the upper reaches of some of its tributaries, the Williamson River drainage above the "reef" is entirely within the boundaries of the former Klamath Reservation. The only lands outside the former reservation, but within the area covered by the Government's suit, were certain parcels of land withdrawn by the United States from the public domain for national forest purposes. These withdrawals occurred in 1893, 1906, 1907 and 1930. See Act of Sept. 28, 1893, 28 Stat. 1240; Act of Sept. 17, 1906, 34 Stat. 3231; Act of Jan. 25, 1907, 34 Stat. 3270; Act of May 14, 1930, 46 Stat. 278
 
 
 [2]
 The McCarran Amendment waives the United States' sovereign immunity for the limited purpose of allowing the Government to be joined as a defendant in a state adjudication of water rights. The Amendment provides in full text:
 (a) Consent is given to join the United States as a defendant in any suit (1) for the adjudication of rights to the use of water of a river system or other source, or (2) for the administration of such rights, where it appears that the United States is the owner of or is in the process of acquiring water rights by appropriation under State law, by purchase, by exchange, or otherwise, and the United States is a necessary party to such suit. The United States, when a party to any such suit, shall (1) be deemed to have waived any right to plead that the State laws are inapplicable or that the United States is not amenable thereto by reason of its sovereignty, and (2) shall be subject to the judgments, orders, and decrees of the court having jurisdiction, and may obtain review thereof, in the same manner and to the same extent as a private individual under like circumstances: Provided, That no judgment for costs shall be entered against the United States in any such suit.
 (b) Summons or other process in any such suit shall be served upon the Attorney General or his designated representative.
 (c) Nothing in this section shall be construed as authorizing the joinder of the United States in any suit or controversy in the Supreme Court of the United States involving the right of States to the use of the water of any interstate stream.
 43 U.S.C. Sec. 666 (1976).
 
 
 [3]
 We believe that this obligation is heightened in a case where not only Indian property rights, including water rights, are involved, but where all rights to be adjudicated were reserved for the benefit of an Indian Tribe. See, e.g., Oneida Indian Nation v. County of Oneida, 414 U.S. 661, 667-68, 94 S.Ct. 772, 777-78, 39 L.Ed.2d 73 (1974); United States v. Kagama, 118 U.S. 375, 384, 6 S.Ct. 1109, 1114, 30 L.Ed. 228 (1886). See also White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 141-44, 100 S.Ct. 2578, 2582-84, 65 L.Ed.2d 665 (1980); Bryan v. Itasca Co., 426 U.S. 373, 388 n. 14, 96 S.Ct. 2102, 2111 n. 14, 48 L.Ed.2d 710 (1976). This is because the federal policy of leaving Indians free from state jurisdiction and control is deeply rooted in our nation's history. See McClanahan v. Arizona State Tax Commission, 411 U.S. 164, 168, 93 S.Ct. 1257, 1260, 36 L.Ed.2d 129 (1973); Rice v. Olson, 324 U.S. 786, 789, 65 S.Ct. 989, 991, 89 L.Ed. 1367 (1945). All of the water rights to be adjudicated by the federal court in this case derive from the "Winters doctrine" of reserved water rights. See Winters v. United States, 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1908). They are water rights reserved to the Klamath Tribe by treaty and passed to subsequent Government, individual Indian, and non-Indian appropriators by operation of fedeRal indian law
 The only water rights addressed by the instant federal court suit lacking roots in the Klamath Treaty of 1864 or other aspects of federal Indian law are the water rights reserved by the Government to those parcels of land withdrawn from the public domain in 1893, 1906, 1907, and 1930. See supra note 1. Even these rights depend on the Winters doctrine and federal law of reserve water rights for a proper determination of their scope. The preference for a federal forum in which to litigate Indian rights governed by federal law has received express congressional approval in a number of statutory enactments. See, e.g., 25 U.S.C. Secs. 345, 1322(b) (1976); 28 U.S.C. Secs. 1360(b), 1362 (1976).
 
 
 [4]
 In Colorado River, the United States filed suit in federal district court in November, 1972, pursuant to 28 U.S.C. Sec. 1345 (1976), for a declaration of the water rights of the United States and certain Indian Tribes, as well as over 1000 individual water users. Shortly after commencement of the federal suit, one of the defendants in that suit sought to have the United States served as a defendant in a continuous state court water rights adjudication under the Colorado Water Rights Determination and Administration Act. The adjudication pursuant to the Colorado statute encompassed the entire drainage basin of which the area addressed by the federal suit was only a part. In early 1973, the United States was served in the state proceeding pursuant to the McCarran Amendment, 43 U.S.C. Sec. 666 (1976). The defendants in the federal suit then moved to dismiss the action in favor of the state suit. The district court agreed that the doctrine of abstention required dismissal in deference to the state proceeding. The Tenth Circuit then reversed the district court's decision to abstain
 The Supreme Court, in reviewing the lower court decisions, agreed with the district court that the McCarran Amendment allows concurrent state and federal jurisdiction over water rights disputes, see Colorado River, 424 U.S. at 809, 96 S.Ct. at 1242, and that the state's jurisdiction extends to federal reserved water rights including Indian water rights. See id. at 809-13, 96 S.Ct. at 1242-44. The Supreme Court, while agreeing with the district court's decision to dismiss, rejected the district court's reliance on traditional abstention doctrine to justify dismissal. Id. at 813, 96 S.Ct. at 1244. Instead, the Court concluded that:
 [T]here are principles unrelated to considerations of proper constitutional adjudication and regard for federal-state relations which govern in situations involving the contemporaneous exercise of concurrent jurisdictions, either by federal courts or by state and federal courts. These principles rest on considerations of "[w]ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation."
 Id. at 817, 96 S.Ct. at 1246 (quoting Kerotest Mfg. Co. v. C-O-Two Fire Equipment Co., 342 U.S. 180, 183, 72 S.Ct. 219, 221, 96 L.Ed. 200 (1952)). The Court proceeded to analyze the "considerations of '[w]ise judicial administration' " in the Colorado River case that counseled dismissal of the federal action in favor of the state proceeding.
 The most important factor in favor of dismissal was the McCarran Amendment itself, in which the Court found expressed a "clear federal policy" to avoid "piecemeal adjudication of water rights in a river system" where a comprehensive state system for adjudication of water rights is available. 424 U.S. at 819, 96 S.Ct. at 1247; accord San Carlos Apache Tribe, --- U.S. at ----, 103 S.Ct. at 3214-15. Of lesser importance, but consistent with the policies underlying the McCarran Amendment, the Court also found significant in its decision to uphold dismissal of the federal action:
 (a) the apparent absence of any proceedings in the District Court, other than the filing of the complaint, prior to the motion to dismiss, (b) the extensive involvement of state water rights ..., (c) the 300-mile distance between the District Court in Denver and [the state water court located within the drainage under adjudication], and (d) the existing participation by the Government [in other proceedings under the Colorado water rights act].
 Id. 424 U.S. at 820, 96 S.Ct. at 1248 (footnote omitted). The Court found that together, these factors "justify the District Court's dismissal in this particular case." Id. (footnote omitted).
 
 
 [5]
 While the Court's analysis in Colorado River of traditional abstention doctrine appears equally applicable to this case, the State argues that recent decisions have significantly expanded Younger abstention. See Trainor v. Hernandez, 431 U.S. 434, 97 S.Ct. 1911, 52 L.Ed.2d 486 (1977); Juidice v. Vail, 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977). It also contends that the abstention discussed in Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), should require dismissal of the federal district court case in favor of the state proceeding. We are not persuaded
 Unlike Colorado River, all claims raised in the federal suit here have their genesis in federal law. Thus we find no occasion to apply Burford abstention. As for Younger abstention, we note that while the complaint in the federal court proceedings sought declaratory and injunctive relief, the request for such relief was not aimed at restraining any state proceeding, nor did the federal plaintiffs seek a declaration as to the validity of any state law or regulation. See Colorado River, 424 U.S. at 816-17, 96 S.Ct. at 1245-46 (discussing abstention under the doctrine enunciated in Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971)). Thus, even if the principles enunciated in Younger have been expanded by recent decisions of the Supreme Court, the instant case is not appropriate for Younger abstention because federal jurisdiction has not been invoked for the purpose of restraining state proceedings or invalidating a state law.
 
 
 [6]
 Although the district court never expressly ruled on the motion to dismiss under Colorado River, the court's Pretrial Order and ultimate decision reflect consideration of the Colorado River factors
 At a September 13, 1976 hearing on defendants' motions to dismiss, the district court and counsel thoroughly discussed the Colorado River case and its application to the facts of this case. In the course of this hearing, the following colloquy between court and counsel occurred:
 The Court: I read the Colorado case and some of the other cases. I concluded that this Court does have jurisdiction; and probably the factual basis of the Colorado River case is not present here because of the limited jurisdiction of the State and because of other differences.
 I would probably deny the request to dismiss at this time. But I think the suggestion that this Court only decides the broad questions and that the State, if it would be willing to do it, would undertake the specific allocation of water, would be an excellent determination and excellent result. I'm very much impressed with your statement [Mr. Biggs, counsel for the individual defendants] in your brief and reiteration of that position here today because I see no reason for anyone, including the Government, to spend money when the State is prepared to do it and where it has already accomplished a great deal.
 When would the Government be ready to argue the legal questions?
 Mr. Redd [counsel for the United States]: Your Honor, I think there is a preliminary step that needs to be done first. I think we have to first agree upon what the federal questions are that need to be decided. I think perhaps we should set down what we consider the federal questions to be in some sort of a memorandum.
 The Court: ... Before you leave, I think you can get together with him [Mr. Biggs] and maybe you can agree on what are the issues. I would like to have Mr. Israel [counsel for the Tribe] in on this conference too because I think they have substantial rights. When I talk about Mr. Biggs, I am not excluding the Attorney General and Mr. Conn [counsel for individual defendants]; but if you could meet this afternoon before you return, I think it would be very productive. I hope that whatever you do, you decide to do it fairly quickly.
 * * *
 Mr. Redd: Could I make this suggestion, Your Honor.
 The Court: Yes.
 Mr. Redd: We are perfectly happy to meet with Mr. Biggs and Mr. Kruger and Mr. Israel and anybody else who is interested today. I will be here until--my plane leaves tomorrow morning at 11:00 o'clock. However, I think what we should do next is, we should submit a memorandum wherein we set out what we consider to be the agreed facts, what we consider to be the facts in which there are no agreements on, as we develop in our meeting and then our contentions of law and then our memorandum in support of our contentions. Mr. Biggs and the other defendants' attorneys could supply a list and date for trial which could be set for argument on that after you have the benefit of those briefs.
 The Court: That's fine.
 Out of this initial discussion grew the district court's Pretrial Order. Apparently, no formal denial of the defendants' motions to dismiss was ever entered.
 
 
 [7]
 The State argues that this traditional test for an abuse of discretion should be replaced by a narrower test. This narrower test the State would have us apply derives from Public Service Comm'n of Utah v. Wycoff Co., 344 U.S. 237, 73 S.Ct. 236, 97 L.Ed. 291 (1952). In Wycoff, the plaintiff sought a declaratory ruling that it was involved in interstate commerce. The Supreme Court held that it would be an abuse of discretion to issue such a ruling because the controversy before the court was too abstract. Id. at 245-48, 73 S.Ct. at 241-43. The State argues that the district court's adjudication of water rights in this case is similarly abstract. We disagree. In this case there exists a genuine controversy which the district court could have resolved finally in every respect. The original complaint requested as relief
 [t]hat, upon final determination of the rights to the use of water of the United States and the rights to the use of water appurtenant to the lands described above and presently owned by defendants, this court appoint a water master to administer the Upper Williamson River system in accordance with the orders and directives of this court.
 The duties of such a master would have included yearly allocation of specific quantities of water to the various parties to the federal suit. The United States only abandoned its request for such specific quantification of water rights and administration of the river system under a federal court decree upon the district court's suggestion that cooperation between state and federal courts would best be served if the federal court addressed only the legal principles governing the extent of and priority among water rights arising under federal law in the litigation area, and left quantification and administration of these rights to later proceedings to be conducted by the State Water Resources Director. See Or.Rev.Stat. Secs. 539.040-539.140 (1979).
 We commend this effort to coordinate federal and state resolution of water rights. Any generality in the district court's order resulted from these coordinating efforts not from the abstract nature of the controversy. Unlike the situation in Wycoff, the plaintiff's request for relief was not one for "preliminary findings and conclusions intended to fortify the litigant against future regulation." 344 U.S. at 246, 73 S.Ct. at 241. Rather, the district court properly decided those elements of a ripe controversy that were governed by federal law, while leaving state law issues necessarily involved in a detailed resolution of the controversy to subsequent state proceedings in order to harmonize the concurrent federal and state jurisdiction mandated by the McCarran Amendment, 43 U.S.C. Sec. 666 (1976).
 
 
 [8]
 We realize, of course, that where both the state and the federal proceedings are in their infancy at the time of a motion to dismiss the federal proceeding, both Colorado River and San Carlos Apache Tribe indicate that absent unusual circumstances, the federal court should defer to the state proceeding. See San Carlos Apache Tribe, at ----, 103 S.Ct. at 3213-15
 
 
 [9]
 The parties argue extensively over the meaning of the word "suit" in the McCarran Amendment. The Government and the Tribe may be technically correct when they suggest that the Oregon water adjudication system is not a "suit" but an administrative proceeding for which there is a form of judicial review. See Or.Rev.Stat. Secs. 539.030, 539.150 (1979). However, the Supreme Court has warned against overly technical application of the McCarran Amendment. United States v. District Court for Eagle County, 401 U.S. 520, 525, 91 S.Ct. 998, 1002, 28 L.Ed.2d 278 (1971). Thus, although the Oregon water rights adjudication system is initially administrative and need not be judicial in nature, we will assume, without deciding, for the purposes of this case that it is not too informal to qualify as a "suit" within the meaning of the McCarran Amendment or a "comprehensive state adjudication" within the meaning of Colorado River and San Carlos Apache Tribe, see San Carlos Apache Tribe, --- U.S. at ----, ---- & n. 20, 103 S.Ct. at 3214, 3215 & n. 20
 
 
 [10]
 Although the Supreme Court's warning is cast in terms of whether the federal proceeding is well enough along at the time of a motion to dismiss, see San Carlos Apache Tribe, at ----, 103 S.Ct. at 3214, the institutional concerns of "wise judicial administration" must not be blind to the overall course of a particular piece of litigation. Judicial resources may as readily be wasted at the trial and appellate levels as at the stage of pre-trial proceedings
 
 
 [11]
 A determination of the priority among reserved water rights, similar to that undertaken by the district court, would require a separate proceeding in the state adjudication prior to the overall quantification of water rights in the Williamson River drainage. See, e.g., Colorado River, 424 U.S. at 825, 96 S.Ct. at 1250 (Stewart, J., dissenting); United States v. New Mexico, 438 U.S. 696, 703-04, 98 S.Ct. 3012, 3015-16, 57 L.Ed.2d 1052 (1978) (Government's claim of reserved water rights in New Mexico general stream adjudication referred out to special master for determination); Avondale Irrigation Dist. v. North Idaho Properties, Inc., 99 Idaho 30, 32 & n. 3, 577 P.2d 9, 11 n. 3 (1978) (noting that the reserved rights of the United States were entered in a partial judgment rendered prior to "adjudicating the rights of the other parties."); see also Abrams, Reserved Water Rights, Indian Rights and the Narrowing Scope of Federal Jurisdiction: The Colorado River Decision, 30 Stan.L.Rev. 1111, 1125 (1978). Such a separate proceeding is necessary because reserved water rights are established by reference to the purpose of the reservation rather than any actual beneficial use of water. See United States v. New Mexico, 438 U.S. at 700, 98 S.Ct. at 3014; Arizona v. California, 373 U.S. 546, 599-600, 83 S.Ct. 1468, 1497-98, 10 L.Ed.2d 542 (1963); Winters v. United States, 207 U.S. 564, 576, 28 S.Ct. 207, 211, 52 L.Ed. 340 (1908). See generally F. Cohen, Handbook of Federal Indian Law 578-96 (1982 ed.). Because the State had begun no proceeding to determine the priority and extent of federal reserved water rights, the district court's decision to conduct the limited and separate ordering of water rights under federal law created little potential for conflicting state and federal court rulings
 For much the same reasons, the district court's exercise of jurisdiction did not enlarge the potential for duplication of judicial effort, or generate needless costly proceedings for the parties. The court recognized that the federal law issues it proposed to resolve could be addressed in the state administrative adjudication of water rights in the Klamath Basin. The court also recognized, however, that such a state administrative determination of federal reserved water rights could be avoided by a prior federal court adjudication. Accordingly, the district court concluded that its resolution of the federal questions raised by the United States' suit would not add an otherwise unnecessary step in the judicial proceedings for establishing water rights in the Klamath Basin. We agree with the district court's conclusion on this point; its allocation of water rights under federal law neither duplicated an on-going state court proceeding nor added a proceeding that the state court would not ordinarily conduct.
 In fact, the district court exercised its jurisdiction in a manner to avoid any direct adjudication of state water rights. Within the federal litigation area all claimants derive their asserted water rights from federal law. The district court recognized this unique aspect of the federal suit and decided only the priority among these federal law-created rights. As the Supreme Court noted in Moses H. Cone Memorial Hospital v. Mercury Construction, 103 S.Ct. at 941, where "federal law provides the rule of decision on the merits" for all of the issues under adjudication, dismissal under the rationale of Colorado River is disfavored. See also Will v. Calvert Fire Ins. Co., 437 U.S. at 667, 98 S.Ct. at 2559 (Blackmun, J., concurring); id. at 667-68, 98 S.Ct. at 2559-60 (Brennan, J., dissenting). Thus, we have no doubt that the district court's decision was proper under the standards set forth in Colorado River.
 
 
 [12]
 In Colorado River, the Supreme Court recognized four secondary factors, less important than the McCarran Amendment policy, that also favored dismissal. First, the Court suggested that the absence of any proceedings in the district court, other than the filing of a complaint, prior to the motion to dismiss, was a factor that favored dismissal. 424 U.S. at 820, 96 S.Ct. at 1247-48. This factor, to the extent that it is important, seeks to avoid waste or duplication of judicial effort. As we have noted, in the instant case, the district court recognized the potential for waste and tailored its exercise of jurisdiction to avoid adjudication of issues that would also arise subsequently in the state forum. Second, in Colorado River, the "extensive involvement of state water rights" counseled dismissal. 424 U.S. at 820, 96 S.Ct. at 1248. There, "the Government asserted reserved rights on its own behalf and on behalf of certain Indian tribes, as well as rights based on state law." Third, the state water court in Colorado River was some 300 miles closer than the federal court to the water system under adjudication. 424 U.S. at 805, 96 S.Ct. at 1240. The inconvenience to the parties occasioned by this distance favored proceeding in the state court. Here, the federal court normally sits in Portland, although it is authorized to sit in Medford and Klamath Falls, Oregon, both communities quite close to the Williamson River. In fact, the district judge offered to conduct the suit in either Medford or Klamath Falls. None of the parties urged a change of location, so we may assume that the inconvenience, if any, of proceeding in Portland was minimal. Finally, in Colorado River, the Supreme Court found "participation by the Government in Division 4, 5, and 6 proceeding," a factor that favored dismissal of the federal suit in order to encourage Government participation in Division 7 water rights proceedings. 424 U.S. at 820, 96 S.Ct. at 1247-48. The State argues that dismissal is similarly appropriate here to encourage the United States to participate in state stream adjudications. Although there is no statewide system in Oregon directly analogous to the Colorado system, Oregon has a water rights adjudication process that may be applied to any stream. See Or.Rev.Stat. 539.010-539.110 (1979). The State argues that the approximately 4,000 Government filings under the state system for determining water rights meets the Government participation factor in Colorado River. Even if the State is correct on this point, we do not find Government participation standing alone, sufficiently weighty to require dismissal of the United States efforts to secure a limited adjudication of federal water rights in a federal court
 
 
 [13]
 See also W. Canby, American Indian Law 245-46 (1981) ("While the purpose for which the federal government reserves other types of lands may be strictly construed, United States v. New Mexico, 438 U.S. 696, 98 S.Ct. 3012, 57 L.Ed.2d 1052 (1979) (national forest), the purposes of Indian reservations are necessarily entitled to broader interpretation if the goal of Indian self-sufficiency is to be attained."). Additionally, where interpretation of an Indian treaty is involved, not only the intent of the Government, but also the intent of the tribe must be discerned. See Washington v. Fishing Vessel Ass'n, 443 U.S. 658, 675-76, 99 S.Ct. 3055, 3069-70, 61 L.Ed.2d 823 (1979)
 
 
 [14]
 The central importance of the Tribe's hunting and fishing rights is confirmed by reference to the historical fact that at the time the 1864 Treaty was negotiated, the Tribe
 hunted and trapped throughout the area set aside in [the] treaty .... They hunted and ate grizzly bear, brown bear, deer, elk, antelope, beaver, racoon, badger and the Modoc also hunted and ate fox, coyote, wolf, puma, wildcat, skunk, porcupine, rabbit, groundhog and gopher. The Klamath Tribe also hunted coyotes, grey-wolves, foxes, badgers, wildcats, rabbits and various fur-bearing animals which furnished blankets and clothing and swans, geese, ducks and wading birds, the majority of which were used by the tribes as food in various ways, the skins of swans, geese, and other birds with especially fine down being made into feather blankets, swaddling clothes, etc.
 Plaintiffs are known to have had a large number of methods of hunting, including driving game into the water or mud, or surrounding it by fire; they trapped game by nooses above the trail (including deer and other large game), and as to birds by nooses held on a stick or suspended from a cord. They netted game, and captured deer and other game in pitfalls; they hunted from booths and blinds and from brush fences or enclosures, and ambushed game from pits and from dugouts run into tules. In hunting they disguised themselves by wearing animal heads and entire skins; they used flares or jacklights to attract waterfowl; they imitated cries of the game, including imitating the cries of a fawn; and they smoked bears out of their dens.
 Klamath and Modoc Tribes v. Maison, 139 F.Supp. at 636-37.
 
 
 [15]
 In fact, the Government was probably aware that hunting and fishing held the greatest promise for sustaining the Klamath on their reservation:
 The land of the Modoc and Klamath Lake Indians is a high, cold plain, nearly on a level with the summit of the Sierra Nevada mountains, too frosty to raise cereal or roots with success, and fit only for grass. The country abounds in wild game and the lakes and streams in fish. The Indians make a good living and raise a great many horses ....
 1864 Report of the Commissioner of Indian Affairs 121.
 
 
 [16]
 The order creating the Colville Reservation read:
 It is hereby ordered that ... the country bounded on the east and south by the Columbia River, on the west by the Okanogan River, and on the north by British possessions, be, and the same is hereby, set apart as a reservation for said Indians, and for such other Indians as the Department of the Interior may see fit to locate thereon.
 Colville Confederated Tribes v. Walton, 647 F.2d 42, 47 (9th Cir.1981) (quoting Executive Order of July 2, 1872, reprinted in 1 Kappler, Indian Affairs and Treaties 916 (2d ed. 1904)).
 
 
 [17]
 3 W. Hutchins, Water Rights Laws in the Nineteen Western States 440-74 (1971); 5 R. Clark, Waters and Water Rights Sec. 400, at 3-4 (1967)
 
 
 [18]
 See, e.g., Colorado River Water Conservation District v. Rocky Mountain Power Co., 158 Colo. 331, 335, 406 P.2d 798, 799-801 (1965) ("there is no support in the law of this state for the proposition that a minimum flow of water may be 'appropriated' in a natural stream for piscatorial purposes without diversion of any portion of the water 'appropriated' from the natural course of the stream"); State ex rel. State Game Commission v. Red River Valley Co., 51 N.M. 207, 216, 182 P.2d 421, 427-32 (1945) (state law does not allow appropriation of waters flowing in a stream for fishing purposes)
 For other cases stating that some form of diversion is required to effect an appropriation, see, e.g., Rodgers v. Pitt, 129 F. 932, 939-40 (D.Nev.1904); Crawford v. Lehi Irrig. Co., 10 Utah 2d 165, 168, 350 P.2d 147, 150 (1960); Sherlock v. Greaves, 106 Mont. 206, 216, 76 P.2d 87, 90 (1938). See also 1 W. Hutchins, Water Rights Laws in the Nineteen Western States 371 (1971). We note, however, that the modern trend in prior appropriation states is to recognize water rights in a natural body of water where the water in its natural state is a source of significant economic benefits. See Colorado River Water Conservation District v. Colorado River Water Conservation Board, 197 Colo. 469, 474, 594 P.2d 570, 574 (1979) (applying 1973 Colorado statute); State Department of Parks v. Idaho Department of Water Administration, 96 Idaho 440, 443, 530 P.2d 924, 928-29 (1974) (applying 1971 Idaho statute).
 
 
 [19]
 The fact that water rights of the type reserved for the Klamath Tribe are not generally recognized under state prior appropriations law is not controlling as federal law provides an unequivocal source of such rights. The Supreme Court decisions in New Mexico and Cappaert establish beyond any doubt that the Winters doctrine is a source of rights to a streamflow, see New Mexico, 438 U.S. at 718, 98 S.Ct. at 3023 and to a given volume of water in a natural pond, see Cappaert, 426 U.S. at 143, 96 S.Ct. at 2072. The Court in those cases found no need to look for a state law basis for the rights it upheld. Rather, a careful reading of the cases confirms that the water rights recognized were defined by federal, not state, law. See New Mexico, 438 U.S. at 713 n. 21, 98 S.Ct. at 3021 n. 21 (suggesting that such a federal right could even now be created by Congress without any overt appropriation, even though the right would take its priority from state law); id. at 715, 98 S.Ct. at 3021-22 ("reserved rights doctrine is a doctrine built on implication and is an exception to Congress' explicit deference to state water law in other areas"); Cappaert, 426 U.S. at 145, 96 S.Ct. at 2073 ("[f]ederal water rights are not dependent upon state law"); see also United States v. Alpine Land & Reservoir Co., 697 F.2d 851, 859-60 (9th Cir.), cert. denied, sub nom. Pyramid Lake Paiute Tribe of Indians v. Truckee-Carson Irrigation District, --- U.S. ----, 104 S.Ct. 193, 78 L.Ed.2d 170 (1983)
 This is not to say, however, that the Tribe's rights are unaffected by state law. Specifically, the priority of the right is, in part, determined by state law, see New Mexico, 438 U.S. at 713 n. 21, 98 S.Ct. at 3021 n. 21, and the precise quantity of water protected must be determined in accordance with state techniques and procedures, see Colorado River, 424 U.S. at 804-05, 819, 96 S.Ct. at 1239-40, 1247 (approving use of "comprehensive state systems" for quantification of water rights). This blend of federal and state law to adjudicate water rights has had recent application by the Supreme Court. See Colorado v. New Mexico, --- U.S. ----, 103 S.Ct. 539, 74 L.Ed.2d 348 (1982) (combination of prior appropriation and equitable apportionment doctrines).
 
 
 [20]
 Appellants cite language from subsection 28(c) of the 1958 amendments to the Termination Act, 72 Stat. 817. Subsection (c) details the method for appraising the fair market value of Klamath Reservation lands: "each appraiser shall estimate the fair market value of such forest units and marshlands as if they had been offered for sale on a competitive market without limitation on use ...." Id. (emphasis added.) These appraisal instructions cannot be read to dictate the substantive conditions of termination
 
 
 [21]
 The reserved water rights doctrine enunciated in Winters v. United States, 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1908), was well recognized by the early 1950's. See, e.g., United States v. Walker River Irrig. Dist., 104 F.2d 334, 339-40 (9th Cir.1939); Conrad Investment Co. v. United States, 161 F. 829, 831 (9th Cir.1908); see also Federal Power Comm'n v. Oregon, 349 U.S. 435, 444, 75 S.Ct. 832, 838, 99 L.Ed. 1215 (1955); United States v. Ahtanum Irrig. Dist., 236 F.2d 321, 325 (1956), cert. denied, 352 U.S. 988, 77 S.Ct. 386, 1 L.Ed.2d 367 (1957)
 
 
 [22]
 In the present case, the Klamath Tribe, as we have noted, has depended upon the waters in question to support its hunting and fishing activities for over 1,000 years. It would be inconsistent with the principles we follow in today's decision to hold that the priority of the Tribe's water rights is any less ancient than the "immemorial" use that has been made of them. See United States v. Shoshone Tribe, 304 U.S. 111, 117, 58 S.Ct. 794, 798, 82 L.Ed. 1213 (1938); F. Cohen, Handbook of Federal Indian Law 591 & n. 100 (1982)
 
 
 [23]
 For a thoughtful argument that this case understates the scope of tribal reservations by treaty of an interest in an environmentally sensitive resource, see Comment, Indian Fishing Rights Return to Spawn: Toward Environmental Protection of Treaty Fisheries, 61 Ore.L.Rev. 93 (1981)
 
 
 [24]
 Appellants argue vigorously that the Tribe can no longer hold a water right to support its treaty hunting and fishing rights because the Tribe no longer owns land to which this water right is appurtenant. Their argument, however, misperceives the history and nature of the Klamath's reserved water rights
 In 1864, when the Klamath Reservation was created and water was impliedly reserved for the benefit of the Tribe, the Indians owned appurtenant land. See United States v. New Mexico, 438 U.S. 696, 698, 98 S.Ct. 3012, 3013, 57 L.Ed.2d 1052 (1978). The issue is whether these water rights, once reserved, are terminated by a transfer of the appurtenant land. We have already held in Kimball I that the Tribe's hunting and fishing rights guaranteed by the treaty survived despite the land transfer. 493 F.2d at 569-70. To find that the water rights necessary to give meaning to these hunting and fishing rights have been lost because the Tribe has disposed of the appurtenant land would effectively overrule the Kimball decisions. We refuse to do so.
 
 
 [25]
 The water rights of Indian irrigators, as the district court noted, are subordinate to the Tribe's right to water for support of its hunting and fishing lifestyle. 478 F.Supp. at 346. This hierarchy among Indian water rights arises, not from any implication in the 1864 treaty that the purpose of hunting and fishing should predominate over any of the other purposes for which the Klamath Reservation was established, but rather from the analytically separate question of what priority date for appropriation the various water rights reserved in the treaty carry. Analysis of this latter question, under the unique circumstances of this case, leads to the conclusion that the Tribe's hunting and fishing water rights carry an earlier priority date for appropriation, because of historical use, than do water rights for irrigation. See supra section III(A)(3)
 
 
 [26]
 Termination of the Klamath Reservation was proclaimed on Aug. 10, 1961. See 26 Fed.Reg. 7362 (1961) (proclamation of James K. Carr, Acting Sec. of Interior, terminating the federal trust relationship with the Klamath Tribe pursuant to 25 U.S.C. Sec. 564q (1976)). Thus according to the second part of section 564m, Oregon law "with respect to abandonment of water rights by nonuse" became applicable to the Tribe and its members in August of 1976
 
 
 [27]
 This result is consistent with our statement in Colville Confederated Tribes v. Walton to the effect that:
 [t]he district court's holding that an Indian allottee may convey only a right to the water he or she has actually appropriated with a priority date of actual appropriation reduces the value of the allottee's right to reserved water. We think this type of restriction on transferability is a "diminution of Indian rights" that must be supported by a clear inference of Congressional intent.
 647 F.2d at 50.
 
 
 [28]
 The district court correctly ruled that, like the water rights of Indian irrigators, the rights of their non-Indian successors are subordinate to tribal hunting and fishing water rights. See 478 F.Supp. at 350; see also supra note 30
 
 
 [29]
 The district court did determine the Government's water rights in forest lands outside of the reservation. See 478 F.Supp. at 347-48. The district court's substantive conclusions on that issue have not been challenged on appeal
 
 
 [30]
 We do not mean to imply, of course, that the tribe holds no other water rights or that some of these rights may not be significant in a particular setting
 
 
 [31]
 A forceful argument can be made that the Klamath's hunting and fishing water rights should not be treated differently from other reserved water rights, such as those for irrigation. Under this view, the Tribe's hunting and fishing water rights would be transferrable to the United States. Cf. Colville Confederated Tribe v. Walton, 647 F.2d at 50-51 (transfer of reserved irrigation water rights). We decline to adopt this analogy, however, because even when the Tribe transfers the land to which the hunting and fishing water rights might be said to be appurtenant, it is the Tribe and its members, not some third party, that retains the right to hunt and fish and needs water to support that right. Where the Tribe transfers land without reserving the right to hunt and fish on it, there is no longer any basis for a hunting and fishing water right. For this reason, we find the Klamath Tribe's hunting and fishing water rights virtually unique and not subject to the ordinary rules of transfer and change of use. See F. Cohen, Handbook of Federal Indian Law 592-96 (1982 ed.) (discussing transfer and change in use of Indian reserved water rights); see also D. Getches, Water Rights on Indian Allotments, 26 S.D.L.Rev. 405 (1981) (criticizing transfer of reserved water rights rule adopted by this court in Colville Confederated Tribe v. Walton )