**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| AGUA CALIENTE BAND OF CAHUILLA INDIANS, *Plaintiff-Appellee*, | No. 15-55896 |
| | D.C. No. 5:13-cv-00883- JGB-SP |
| UNITED STATES OF AMERICA, *Intervenor-Plaintiff-Appellee*, | |
| v. | OPINION |
| COACHELLA VALLEY WATER DISTRICT; ED PACK, in Official Capacity as Member of the Board of Directors of the Coachella Valley Water District; JOHN POWELL, JR., in Official Capacity as Member of the Board of Directors of the Coachella Valley Water District; PETER NELSON, in Official Capacity as Member of the Board of Directors of the Coachella Valley Water District; G. PATRICK O'DOWD, in Official Capacity as a Member of the Board of Directors of the Coachella Valley Water District; CASTULO R. ESTRADA, in Official Capacity as a Member of the Board of Directors of the Coachella Valley Water District; DESERT WATER AGENCY; PATRICIA G. OYGAR, in Official Capacity as Member of the Board of Directors of | |

the Desert Water Agency; THOMAS
KIELEY, III, in Official Capacity as
Member of the Board of Directors of
the Desert Water Agency; JAMES
CIOFFI, in Official Capacity as
Member of the Board of Directors of
the Desert Water Agency; CRAIG A.
EWING, in Official Capacity as
Member of the Board of Directors of
the Desert Water Agency; JOSEPH K.
STUART, in Official Capacity as
Member of the Board of Directors of
the Desert Water Agency,
                    *Defendants-Appellants.*

Appeal from the United States District Court
For the Central District of California
Jesus G. Bernal, District Judge, Presiding

Argued and Submitted October 18, 2016
Pasadena, California

Filed March 7, 2017

Before:  Richard C. Tallman and Morgan B. Christen,
Circuit Judges, and Matthew F. Kennelly,[*] District Judge.

Opinion by Judge Tallman

---

[*] The Honorable Matthew F. Kennelly, United States District Judge
for the Northern District of Illinois, sitting by designation.

## SUMMARY[**]

---

### Water Rights / Tribal Rights

The panel affirmed the district court's partial summary judgment in favor of the Agua Caliente Band of Cahuilla Indians and the United States, which declared that the United States impliedly reserved appurtenant water sources, including groundwater, when it created the Tribe's reservation in California's arid Coachella Valley.

The Tribe filed this action for declaratory and injunctive relief against water agencies, and the parties stipulated to divide the litigation into three phases. Phase I, at issue in this interlocutory appeal, addressed whether the Tribe has a reserved right to groundwater.

Under the doctrine in *Winters v. United States*, 207 U.S. 564 (1908), federal reserved water rights are directly applicable to Indian reservations.

The panel held that the Winters doctrine does not distinguish between surface water and groundwater. The panel held that the United States, in establishing the Agua Caliente reservation, impliedly reserved water. The panel further held that because the United States intended to reserve water when it established a home for the Agua Caliente Band of Cahuilla Indians, the district court did not err in determining that the government reserved appurtenant water sources – including groundwater – when it created the

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Tribe's reservation in the Coachella Valley. The panel also held that the creation of the Agua Caliente Reservation carried with it an implied right to use water from the Coachella Valley aquifer.

The panel rejected the water agencies' arguments concerning the contours of the Tribe's reserved water rights. The panel held that state water rights are preempted by federal reserved rights. The panel also held that the fact that the Tribe did not historically access groundwater did not destroy its right to groundwater now. Finally, the panel held that the Tribe's entitlement to state water did not affect the analysis with respect to the creation of the Tribe's federally reserved water right.

## COUNSEL

Steven Bane Abbott (argued), Gerald D. Shoaf, and Julianna K. Tillquist, Redwine and Sherrill, Riverside, California, for Defendants-Appellants Coachella Valley Water District, G. Patrick O'Dowd, Ed Pack, John Powell Jr., Peter Nelson, and Castulo R. Estrada.

Roderick E. Walston (argued), Arthur L. Littleworth, Michael T. Riddell, and Steven G. Martin, Best Best & Krieger LLP, Walnut Creek, California, for Defendants-Appellants Desert Water Agency, Patricia G. Oygar, Thomas Kieley III, James Cioffi, Craig A. Ewing, and Joseph K. Stuart.

Catherine F. Munson (argued), Kilpatrick Townsend & Stockton LLP, Washington, D.C.; Steven C. Moore and Heather Whiteman Runs Him, Native American Rights

Fund, Boulder, Colorado; Mark H. Reeves, Kilpatrick Townsend & Stockton LLP, Augusta, Georgia; Adam H. Charnes, Kilpatrick Townsend & Stockton LLP, Dallas, Texas; for Plaintiff-Appellee.

Elizabeth A. Peterson (argued), Yosef M. Negose, Daron T. Carreiro, Patrick Barry, John L. Smeltzer, and William B. Lazarus, Attorneys; John C. Cruden, Assistant Attorney General; United States Department of Justice, Washington, D.C.; Christopher Watson and Scott Bergstrom, Office of the Solicitor, United States Department of the Interior, Washington, D.C.; for Intervenor-Plaintiff-Appellee.

## OPINION

TALLMAN, Circuit Judge:

> "When the well's dry, we know the worth of water." Benjamin Franklin (1706–1790), Poor Richard's Almanac.

The Coachella Valley Water District ("CVWD") and the Desert Water Agency ("DWA") (collectively, the "water agencies") bring an interlocutory appeal of the district court's grant of partial summary judgment in favor of the Agua Caliente Band of Cahuilla Indians (the "Tribe") and the United States. The judgment declares that the United States impliedly reserved appurtenant water sources, including groundwater, when it created the Tribe's reservation in California's arid Coachella Valley. We agree. In affirming, we recognize that there is no controlling federal appellate authority addressing whether the reserved rights doctrine applies to groundwater. However, because we

conclude that it does, we hold that the Tribe has a reserved right to groundwater underlying its reservation as a result of the purpose for which the reservation was established.

# I

## A

The Agua Caliente Band of Cahuilla Indians has lived in the Coachella Valley since before California entered statehood in 1850. The bulk of the Agua Caliente Reservation was formally established by two Presidential Executive Orders issued in 1876 and 1877, and the United States, pursuant to statute, now holds the remaining lands of the reservation in trust for the Tribe. The reservation consists of approximately 31,396 acres interspersed in a checkerboard pattern amidst several cities within Riverside County, including Palm Springs, Cathedral City, and Rancho Mirage. *See Agua Caliente Band of Mission Indians v. Riverside County*, 442 F.2d 1184, 1185 (9th Cir. 1971).

The Executive Orders establishing the reservation are short in length, but broad in purpose. In 1876, President Ulysses S. Grant ordered certain lands "withdrawn from sale and set apart as reservations for the permanent use and occupancy of the Mission Indians in southern California." Exec. Order of May 15, 1876. Similarly, President Rutherford B. Hayes's 1877 Order set aside additional lands for "Indian purposes." Exec. Order of Sept. 29, 1877. These orders followed on the heels of detailed government reports from Indian agents, which identified the urgent need to reserve land for Indian use in an attempt to encourage tribal members to "build comfortable houses, improve their acres, and surround themselves with home comforts." Comm'r of Indian Aff., Ann. Rep. 224 (1875). In short, the United

States sought to protect the Tribe and "secure the Mission Indians permanent homes, with land and water enough." Comm'r of Indian Aff., Ann. Rep. 37 (1877).

Establishing a sustainable home in the Coachella Valley is no easy feat, however, as water in this arid southwestern desert is scarce. Rainfall totals average three to six inches per year, and the Whitewater River System—the valley's only real source of surface water—produces an average annual supply of water that fluctuates between 4,000 and 9,000 acre-feet, most of which occurs in the winter months.[1] *See* CVWD, Engineer's Report on Water Supply and Replenishment Assessment at III-12 (2016–2017); CVWD, Urban Water Management Plan at 3-2, 3-20 (2005). In other words, surface water is virtually nonexistent in the valley for the majority of the year. Therefore, almost all of the water

---

[1] An acre-foot is the volume of water sufficient to cover one acre in area at a depth of one foot. CVWD, 2010–2011 Annual Review at 2. It is equivalent to 325,851 gallons. *Id.* It takes about four acre-feet of water to irrigate one acre of land for a year in the Coachella Valley. *See* U.S. Dep't of Agric., A Review of Agricultural Water Use in the Coachella Valley at 6 (2006). Therefore, at 9,000 acre-feet per year, the river system provides enough water to irrigate around 2,250 acres. At 4,000 acre-feet per year, the system can only irrigate about 1,000 acres. Considering that the Tribe is not the only user of the Whitewater River System, and that its reservation alone accounts for 31,396 acres, even in a peak year the river system provides very little water for irrigation or for human consumption.

consumed in the region comes from the aquifer underlying the valley—the Coachella Valley Groundwater Basin.[2]

The Coachella Valley Groundwater Basin supports 9 cities, 400,000 people, and 66,000 acres of farmland. *See* CVWD-DWA, The State of the Coachella Valley Aquifer at 2. Given the demands on the basin's supply, it is not surprising that water levels in the aquifer have been declining at a steady rate. Since the 1980s, the aquifer has been in a state of overdraft,[3] which exists despite major efforts to recharge the basin with water delivered from the California Water Project and the Colorado River. In total, groundwater pumping has resulted in an average annual recharge deficit of 239,000 acre-feet, with cumulative overdraft estimated at 5.5 million acre-feet as of 2010.

The Tribe does not currently pump groundwater on its reservation. Rather, it purchases groundwater from Appellant water agencies. The Tribe also receives surface water from the Whitewater River System, particularly the Andreas and Tahquitz Creeks that sometimes flow nearby. The surface water received from this system is consistent with a 1938 California Superior Court adjudication—the Whitewater River Decree—which attempted to address state-law water rights for users of the river system. Because the United States held the lands in trust, it participated in the

---

[2] The CVWD estimates that surface water accounts for less than five percent of its water supply each year. *See* CVWD, Urban Water Management Plan at 3-20 (2005).

[3] Overdraft occurs when the amount of water extracted from the underground basin exceeds its recharge rate. CVWD, 2010–2011 Annual Review at 2.

adjudication via a "Suggestion" on behalf of the Tribe and the resulting state court order included a water allotment for the Tribe's benefit.[4] The amount of water reserved for the Tribe from this adjudication, however, is minimal, providing enough water to irrigate approximately 360 acres. Further, most of this allotment is filled outside of the growing season because the river system's flow peaks between December and March. Thus, groundwater supplied by the water agencies remains the main source of water for all types of consumption on the reservation throughout the year.

## B

Given an ever-growing concern over diminishing groundwater resources, the Agua Caliente Tribe filed this action for declaratory and injunctive relief against the water agencies in May 2013. The Tribe's complaint requested a declaration that it has a federally reserved right and an aboriginal right to the groundwater underlying the reservation. In June 2014, the district court granted the United States' motion to intervene as a plaintiff. The United States also alleges that the Tribe has a reserved right to groundwater.

The parties stipulated to divide the litigation into three phases. Phase I, at issue here, seeks to address whether the Tribe has a reserved right and an aboriginal right to groundwater. According to the parties' stipulation, Phase II

---

[4] In providing this "Suggestion," the government maintained that it was not "submitting the rights of the United States . . . to the jurisdiction of the Department of Public Works of the State of California" and that the court lacked "jurisdiction [to adjudicate] the water rights of the United States." The federal government continues to maintain this position before us.

will address whether the Tribe beneficially owns the "pore space" of the groundwater basin underlying the Agua Caliente Reservation and whether a tribal right to groundwater includes the right to receive water of a certain quality. Finally, Phase III will attempt to quantify any identified groundwater rights.

In March 2015, the district court granted in part and denied in part Plaintiffs' and Defendants' cross motions for partial summary judgment with respect to Phase I of the litigation. In its order, the district court held that the reserved rights doctrine applies to groundwater and that the United States reserved appurtenant groundwater when it established the Tribe's reservation.[5] The district court then certified its order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b), and we granted the water agencies' petition for permission to prosecute this appeal.

## II

The district court's grant of summary judgment is reviewed de novo. *Tohono O'odham Nation v. City of Glendale*, 804 F.3d 1292, 1297 (9th Cir. 2015); *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (en banc). Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48

---

[5] The district court also held that the Tribe does not have an aboriginal right to the groundwater. An aboriginal right is a type of property right that derives from territorial occupancy of land. *See United States ex rel. Chunie v. Ringrose*, 788 F.2d 638, 641–42 (9th Cir. 1986). However, the Tribe did not appeal this issue, and we do not review it here.

(1986). A court shall grant summary judgment when, "under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson*, 477 U.S. at 250.

## III

Due to the unusual trifurcation of this litigation, we are concerned on appeal only with Phase I—whether the Tribe has a federal reserved right to the groundwater underlying its reservation. This question, however, is best analyzed in three steps: whether the United States intended to reserve water when it created the Tribe's reservation; whether the reserved rights doctrine encompasses groundwater; and, finally, whether the Tribe's correlative rights under state law or the historic lack of drilling for groundwater on the reservation, or the water the Tribe receives pursuant to the Whitewater River Decree, impacts our answers to these questions. We address each in turn.

## A

For over one hundred years, the Supreme Court has made clear that when the United States "withdraws its land from the public domain and reserves it for a federal purpose, the Government, by implication, reserves appurtenant water then unappropriated to the extent needed to accomplish the purpose of the reservation." *Cappaert v. United States*, 426 U.S. 128, 138 (1976) (citing U.S. Const. art. I, § 8; U.S. Const. art. IV, § 3); *see also Winters v. United States*, 207 U.S. 564, 575–78 (1908); *Colville Confederated Tribes v. Walton*, 647 F.2d 42, 46 (9th Cir. 1981).

In what has become known as the *Winters* doctrine, federal reserved water rights are directly applicable "to Indian reservations and other federal enclaves,

encompassing water rights in navigable and nonnavigable streams." *See Cappaert*, 426 U.S. at 138. The creation of these rights stems from the belief that the United States, when establishing reservations, "intended to deal fairly with the Indians by reserving for them the waters without which their lands would have been useless." *Arizona v. California*, 373 U.S. 546, 600 (1963); *see also id.* at 598–99 ("It is impossible to believe that when Congress created the great Colorado River Indian Reservation and when the Executive Department of this Nation created the other reservations they were unaware that most of the lands were of the desert kind—hot, scorching sands—and that water from the river would be essential to the life of the Indian people and to the animals they hunted and the crops they raised.").

Despite the longstanding recognition that Indian reservations, as well as other reserved lands, require access to water, the *Winters* doctrine only applies in certain situations: it only reserves water to the extent it is necessary to accomplish the purpose of the reservation, and it only reserves water if it is appurtenant to the withdrawn land. *Winters*, 207 U.S. at 575–78; *Cappaert*, 426 U.S. at 138. Once established, however, *Winters* rights "vest[] on the date of the reservation and [are] superior to the rights of future appropriators." *Cappaert*, 426 U.S. at 138.

## B

### 1

Given the limitations in the *Winters* doctrine, we must first decide whether the United States, in establishing the Agua Caliente Reservation, impliedly reserved water. *See United States v. New Mexico*, 438 U.S. 696, 701 (1978). We conclude that it did. And although the parties and the district

court focused on the application of the *Winters* doctrine to groundwater specifically, their argument over the creation of a federal reserved right—and, in particular, the relevance of *New Mexico* to that question—depends on whether the Agua Caliente Reservation carried with it a reserved right to water generally. Whether the Tribe's reserved right extends to the groundwater underlying its reservation is a separate question from whether the establishment of the reservation contained an implicit right to use water.

In *New Mexico*, the Supreme Court emphasized that, under the reserved rights doctrine, the government reserves only "that amount of water necessary to fulfill the purpose of the reservation, no more." *Id.* (quoting *Cappaert*, 426 U.S. at 141). "Where water is only valuable for a secondary use of the reservation, . . . the United States [must] acquire water in the same manner as any other public or private appropriator." *Id.* at 702. In other words, *New Mexico* established a "primary-secondary use" distinction. Water is impliedly reserved for primary purposes. It is not, however, reserved for secondary purposes.[6]

The water agencies argue that *New Mexico* requires us—when deciding if a reserved right exists at all—to determine whether water is necessary to fulfill the primary purpose of the Agua Caliente Reservation. If it is not, they argue, then we are to conclude that Congress did not intend any water to be impliedly reserved under a federal water right. Put

---

[6] We have previously noted that *New Mexico* is "not directly applicable to *Winters* doctrine rights on Indian reservations." *United States v. Adair*, 723 F.3d 1394, 1408 (9th Cir. 1983). However, it clearly "establish[es] several useful guidelines." *Id.* Thus, we consider its application here.

differently, the water agencies argue that *New Mexico* stands for the proposition that water is impliedly reserved only if other sources of water then available cannot meet the reservation's water demands. According to the water agencies, if other sources of water exist—and the lack of a federal right would not entirely defeat the purpose of the reservation—then Congress intended to defer to state water law and require the United States to obtain water rights like any other private user.

*New Mexico*, however, is not so narrow. Congress does not defer to state water law with respect to reserved rights. *Id.* at 702, 715. Instead, Congress retains "its authority to reserve unappropriated water . . . for use on appurtenant lands withdrawn from the public domain for specific federal purposes." *Id.* at 698.

The federal purpose for which land was reserved is the driving force behind the reserved rights doctrine. "Each time [the] Court has applied the 'implied-reservation-of-water-doctrine,' it has carefully examined both the asserted water right and the specific purposes for which the land was reserved, and concluded that without the water the purposes of the reservation would be entirely defeated." *Id.* at 700. But the question is not whether water stemming from a federal right is necessary at some selected point in time to maintain the reservation; the question is whether the purpose underlying the reservation envisions water use.

*Winters* itself established that the purpose of the reservation is controlling. In *Winters*, the Supreme Court addressed whether the federal government reserved water for tribal usage at the Fort Belknap Indian Reservation, which had been reserved by the United States "as and for a permanent home" for several tribes. 207 U.S. at 565. The

*Winters* Court observed that the arid tribal reservation would be "practically valueless," and that a civilized community "could not be established thereon," without irrigation. *Id.* at 576. Thus, the Court held that, in creating the reservation, the United States simultaneously reserved water "for a use which would be necessarily continued through years." *Id.* at 577. The reserved right turned on the purpose underlying the formation of the Fort Belknap Reservation.

Though it was decided seventy years after *Winters*, *New Mexico* remains faithful to this construction. In analyzing the reserved rights doctrine, the Court first sought to determine Congress' intent in creating the Gila National Forest. *New Mexico*, 438 U.S. at 698. After reviewing the congressional act that established the forest, the Court determined that Congress intended only two purposes—"to conserve the water flows, and to furnish a continuous supply of timber for the people." *Id.* at 707 (citation omitted). It did not, however, reserve the forest lands for aesthetic, environmental, recreational, or wildlife-preservation purposes. *Id.* at 708. Thus, the Court deemed the latter uses "secondary," for which the reserved right did not attach, and held that only "to fulfill the very purposes for which a federal reservation was created . . . [did] the United States intend[] to reserve the necessary water." *Id.* at 702.

As such, *New Mexico*'s primary-secondary use distinction did not alter the test envisioned by *Winters*. Rather, it added an important inquiry related to the question of *how much* water is reserved. It also answered that question by holding that water is reserved only for primary purposes, those directly associated with the reservation of land. It did not, however, eliminate the threshold issue—that

a reserved right exists if the purposes underlying a reservation envision access to water.

## 2

Because *New Mexico* holds that water is reserved if the primary purpose of the reservation envisions water use, we now determine the primary purpose of the Tribe's reservation and whether that purpose contemplates water use.  To do so, we consider "the document and circumstances surrounding [the reservation's] creation, and the history of the Indians for whom it was created."  *Walton*, 647 F.2d at 47.

The Executive Orders establishing the Tribe's reservation declared that the land was to be set aside for "the permanent use and occupancy of the Mission Indians" or, more generally, for "Indian purposes."[7]  *See supra* Part I.  While imprecise, such a purpose is not indecipherable.  Our precedent recognizes that "[t]he specific purposes of an Indian reservation .  .  .  [are] often unarticulated.  The general purpose, *to provide a home for the Indians*, is a broad one and must be liberally construed."  *Walton*, 647 F.2d at 47 (emphasis added).  Moreover, "[m]ost of the land in these reservations is and always has been arid," and it is impossible to believe that the United States was unaware "that water .  .  .  would be essential to the life of the Indian people."  *Arizona*, 373 U.S. at 598–99.

---

[7] Additionally, government reports preceding the Executive Orders recognized the need to secure the Tribe "permanent homes, with land and water enough."  *See* Comm'r of Indian Aff., Ann. Rep. 37 (1877).

The situation facing the Agua Caliente Tribe is no different.  Water is inherently tied to the Tribe's ability to live permanently on the reservation.  Without water, the underlying purpose—to establish a home and support an agrarian society—would be entirely defeated.  Put differently, the primary purpose underlying the establishment of the reservation was to create a home for the Tribe, and water was necessarily implicated in that purpose.  Thus, we hold that the United States implicitly reserved a right to water when it created the Agua Caliente Reservation.

## C

While we conclude that the federal government envisioned water use when it established the Tribe's reservation, that does not end our inquiry.  We must now determine whether the *Winters* doctrine, and the Tribe's reserved water right, extends to the groundwater underlying the reservation.  And while we are unable to find controlling federal appellate authority explicitly holding that the *Winters* doctrine applies to groundwater,[8] we now expressly hold that it does.

Apart from the requirement that the primary purpose of the reservation must intend water use, the other main limitation of the reserved rights doctrine is that the

---

[8] We previously held that the *Winters* doctrine applies "not only [to] surface water, but also to underground water."  *United States v. Cappaert*, 508 F.2d 313, 317 (9th Cir. 1974), *aff'd on other grounds*, *Cappaert*, 426 U.S. at 142.  But on appeal, the Supreme Court did not reach this question.  *See Cappaert*, 426 U.S. at 142.  In that case, the peculiarities of the hydrological forms led the Court to conclude as a question of fact that the reserved water in a cavern pool was surface water, not groundwater.  *Id.*

unappropriated water must be "appurtenant" to the reservation. *See Cappaert*, 426 U.S. at 138. Appurtenance, however, simply limits the reserved right to those waters which are attached to the reservation. It does not limit the right to surface water only. *Cappaert* itself hinted that impliedly reserved waters may include appurtenant groundwater when it held that "the United States can protect its water from subsequent diversion, whether the diversion is of surface or groundwater." *Id.* at 143. If the United States can protect against groundwater diversions, it follows that the government can protect the groundwater itself.[9]

Further, many locations throughout the western United States rely on groundwater as their only viable water source. *See, e.g.*, *In re Gen. Adjudication of All Rights to Use Water in Gila River Sys. & Source*, 989 P.2d 739, 746 (Ariz. 1999) (en banc) ("The reservations considered in [*Winters* and *Arizona*] depended for their water on perennial streams. But some reservations lack perennial streams and depend for present and future survival substantially or entirely upon pumping of underground water. We find it no more thinkable in the latter circumstance than in the former that

---

[9] Although the district court found that the groundwater contained in the Coachella Valley aquifer "does not 'add to, contribute to or support' any surface stream from which the Tribe diverts water," that does not mean that the hydrological cycle in the Coachella Valley has been severed. *See* U.S. Geological Surv., Ground Water and Surface Water: A Single Resource, U.S.G.S. Circular 1139 at 9–10 (1998) (recognizing a connection between surface and groundwater even where the water table falls below the stream bed). Further, we note that surface water is used here to replenish groundwater sources. As such, the district court may wish to hear expert opinion on the interconnectedness of the waters in the valley in the later phases of this litigation. Proper factual findings on this issue will allow the district court to fashion appropriate relief during the quantification phase.

the United States reserved land for habitation without reserving the water necessary to sustain life."). More importantly, such reliance exists here, as surface water in the Coachella Valley is minimal or entirely lacking for most of the year. Thus, survival is conditioned on access to water—and a reservation without an adequate source of surface water must be able to access groundwater.

The *Winters* doctrine was developed in part to provide sustainable land for Indian tribes whose reservations were established in the arid parts of the country. And in many cases, those reservations lacked access to, or were unable to effectively capture, a regular supply of surface water. Given these realities, we can discern no reason to cabin the *Winters* doctrine to appurtenant surface water. As such, we hold that the *Winters* doctrine encompasses both surface water and groundwater appurtenant to reserved land.[10] The creation of the Agua Caliente Reservation therefore carried with it an implied right to use water from the Coachella Valley aquifer.

## D

The final issue we must address is the contours of the Tribe's reserved right, including its relation to state water law and the Tribe's existing water rights.

A "reserved right in unappropriated water . . . vests on the date of the reservation and is superior to the rights of future appropriators." *Cappaert*, 426 U.S. at 138. Further, reserved rights are not analyzed "in terms of a balancing

---

[10] The parties do not dispute appurtenance, nor could they. The Coachella Valley Groundwater Basin clearly underlies the Tribe's reservation. *See generally* CVWD, Engineer's Report on Water Supply and Replenishment Assessment (2016–2017).

test." *Id.* Rather, they are federal water rights that preempt conflicting state law. *See Walton*, 647 F.2d at 51–53; *see also New Mexico*, 438 U.S. at 715 ("[T]he 'reserved rights doctrine' . . . is an exception to Congress' explicit deference to state water law in other areas."). Finally, the rights are not lost through non-use. *See Walton*, 647 F.2d at 51. Instead, they are flexible and can change over time. *See id.* at 47–48; *United States v. Ahtanum Irrigation Dist.*, 236 F.2d 321, 326 (9th Cir. 1956).

Despite the federal primacy of reserved water rights, the water agencies argue that because (1) the Tribe has a correlative right to groundwater under California law and (2) the Tribe has not drilled for groundwater on its reservation, and (3) because the Tribe is entitled to surface water from the Whitewater River Decree, the Tribe does not need a federal reserved right to prevent the purpose of the reservation from being entirely defeated. Put differently, the water agencies argue that, because the Tribe is already receiving water pursuant to California's correlative rights doctrine and the Whitewater River Decree, a federal reserved right is unnecessary.

However, the water agencies' arguments fail for three reasons. First, state water rights are preempted by federal reserved rights. *See Walton*, 647 F.2d at 51; *see also Ahtanum Irrigation Dist.*, 236 F.2d at 329 ("Rights reserved by treaties such as this are not subject to appropriation under state law, nor has the state power to dispose of them."). Second, the fact that the Tribe did not historically access groundwater does not destroy its right to groundwater now. *See Walton*, 647 F.2d at 51. And third, the *New Mexico* inquiry does not ask if water is currently needed to sustain the reservation; it asks whether water was envisioned as

necessary for the reservation's purpose at the time the reservation was created. *See supra* Part III.B. Thus, state water entitlements do not affect our analysis with respect to the creation of the Tribe's federally reserved water right.

## IV

In sum, the *Winters* doctrine does not distinguish between surface water and groundwater. Rather, its limits derive only from the government's intent in withdrawing land for a public purpose and the location of the water in relation to the reservation created. As such, because the United States intended to reserve water when it established a home for the Agua Caliente Band of Cahuilla Indians, we hold that the district court did not err in determining that the government reserved appurtenant water sources—including groundwater—when it created the Tribe's reservation in the Coachella Valley.

Finally, we recognize that the district court's failure to conduct a thorough *New Mexico* analysis with respect to whether the Tribe needs access to groundwater was largely a function of the parties' decision to trifurcate this case. We also understand that a full analysis specifying the scope of the water reserved under *New Mexico* will be considered in the subsequent phases of this litigation.

Presumably, however, the water agencies will continue to argue in these later phases that the *Winters* doctrine is dependent upon the Tribe's demonstrated need—that is, need above and beyond what the Tribe is already receiving under state-law entitlements or could receive through a paramount surface water right. And while we express no opinion on how much water falls within the scope of the Tribe's federal groundwater right, there can be no question

that water in some amount was necessarily reserved to support the reservation created.  Thus, to guide the district court in its later analysis, we hold that the creation of the Agua Caliente Reservation carried with it an implied right to use water from the Coachella Valley aquifer.

Each party shall bear its own costs.

**AFFIRMED.**