This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**STATE OF NEW MEXICO ex rel.**
**STATE ENGINEER,**

Plaintiff-Appellee,

v.                                                      **NO. A-1-CA-33437**

**UNITED STATES OF AMERICA,**

Defendant-Appellee,

v.

**NAVAJO NATION,**

Defendant-Intervenor-Appellee,

v.

**GARY HORNER,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF SAN JUAN COUNTY**
**James J. Wechsler, District Judge**

Arianne Singer, Special Assistant Attorney General
Santa Fe, NM

Utton & Kery, P.A.
John W. Utton, Special Assistant Attorney General

Santa Fe, NM

for Appellee State of New Mexico, New Mexico Office of the State Engineer


Navajo Nation Department of Justice
Stanley M. Pollack
M. Kathryn Hoover
Window Rock, AZ

for Appellee Navajo Nation


United States Department of Justice Appellate Section
Environment & Natural Resources Division
John C. Cruden, Assistant Attorney General
Andrew J. Guarino
Mark R. Haag
Washington, D.C.

for Appellee United States of America

Gary L. Horner
Farmington, NM

Pro Se Appellant

Tully Law Firm, P.A.
Richard T. C. Tully
Farmington, NM

for B Square Ranch; Bolack Minerals Company, a/k/a Bolack Minerals Company Limited Partnership; Estate of Tom Bolack; a/k/a Thomas Felix Bolack, Deceased; Bolack Minerals Foundation; Tommy Bolack Revocable Trust; Estate of Juanita Velasquez, Deceased; David A. Pierce; Maxine M. Pierce; David M. Drake; and Shawna Drake

Victor R. Marshall & Associates, P.C.
Victor R. Marshall

2

Albuquerque, NM

for San Juan Agricultural Water Users, Hammond Conservancy District, Bloomfield Irrigation District, Various Ditches and Various Members Thereof

Law Office of Priscilla A. Shannon
Priscilla A. Shannon
Farmington, NM

for McCarty Trust et al., Stephen Albert McCarty, Trustee; and Estate of Mary McCarty, a/k/a Mary Louise McCarty, Deceased

Public Service Company of New Mexico
Mikal M. Altomare
Albuquerque, NM

for and Tucson Electric Power Company

Ute Mountain Ute Tribe
Office of General Counsel
Leland Begay, Associate General Counsel
Peter Ortego
Lee Bergen
Towaoc, CO

Samuel L. Winder
Albuquerque, NM

for Ute Mountain Ute Tribe

Modrall, Sperling, Roehl, Harris & Sisk, P.A.
Maria O'Brien
Christina C. Sheehan
Zoë E. Lees
Albuquerque, NM

for BHP Billiton New Mexico Coal Inc. and Enterprise Field Services, LLC

3

Stein & Brockmann, P.A.
Jay F. Stein
James C. Brockmann
Santa Fe, NM

for Albuquerque Bernalillo County Water Utility Authority, City of Española, and City of Gallup

Keleher & McLeod, P.A.
Cassandra R. Malone
Richard B. Cole
Albuquerque, NM

for Cities of Aztec and Bloomfield

Taylor & McCaleb, P.A.
Elizabeth Newlin Taylor
Jolene L. McCaleb
Corrales, NM

for Appellee San Juan Water Commission

Dumas Law Office, LLC
Jenny J. Dumas
Albuquerque, NM

for Appellee Jicarilla Apache Nation

C. Brad Lane Cates
Fairacres, NM

for Amici Paul Bandy, Steve Neville, and Carl Trujillo

**MEMORANDUM OPINION**

**BLACK, Judge.**

**Factual and Procedural Background**

{1}    In light of the Navajo Nation's potential claim for the majority of water in the San Juan River Basin, the State of New Mexico initiated a general stream adjudication to determine the water rights of the major claimants to water from that surface water system in 1975. The United States asserted claims as trustee for the Navajo Nation and the Navajo Nation intervened on its own behalf. Following years of litigation, the State entered into settlement negotiations with the Navajo Nation and the United States during the 1990s. The State proposed a blueprint for a settlement and held public meetings in Farmington and Bloomfield seeking input from the non-Indian water users. In response to substantial public input, the State revised its settlement proposals.

{2}    In 2005, following more than a decade of negotiation, the Navajo Nation, the United States of America, and the State of New Mexico reached an agreement settling the Navajo Nation's claims to water in the San Juan River Basin (the Settlement). Federal legislation to approve and implement the Settlement agreement was enacted

by Congress in 2009 under the Omnibus Public Land Management Act of 2009, Pub. L. No. 111-11, § 10301, 123 Stat. 991 (2009) (Northwestern New Mexico Rural Water Projects Act), and signed by the President. The New Mexico Legislature then appropriated $50 million to pay New Mexico's cost of the Settlement and authorized the New Mexico State Engineer to bring a suit seeking judicial approval on the State's share of the water. *See* NMSA 1978, § 72-1-12 (2005); State of New Mexico, Office of the State Engineer, 2017 Indian Water Rights Settlement Fund Report, 3-4 (2017), https://www.nmlegis.gov/handouts/IAC%20112717%20Item%206%20Office%20of%20the%20State%20Engineer%202017%20Indian%20Water%20Rights%20Settlement%20Fund%20Report.pdf; *see also* United States Department of the Interior Bureau of Reclamation, Navajo-Gallup Water Supply Project: Cost Share Agreement Between the United States and the State of New Mexico, 11 (2011), http://www.ose.state.nm.us/Legal/settlements/ NNWRS/NavajoSettlement/NGWSP -OriginalCostShareAgreement.pdf.

{3}     In the subsequent suit, the settling parties asked the San Juan County District Court to approve the water rights previously allocated in congressional legislation for the Navajo Indian Irrigation Project (NIIP), Fruitland-Cambridge Irrigation Project, Hogback-Cudei Irrigation Project, Navajo Gallup Water Supply Project (NGWSP), Animas-La Plata Project (ALP), San Juan River municipal and industrial uses,

6

reserved groundwater, and rights based on stock, irrigation, and recreational uses as of January 1, 2011. Others with an interest in the Settlement were invited into this inter se proceeding through widely distributed radio announcements, newspaper notices, and over 19,000 first class letters to those water rights holders who had title of record.

{4}     At the initiation of the proceedings, the district court imposed an unusually stringent evidentiary burden on the settling parties to prove the Settlement was fair, adequate, and reasonable as well as in the public interest.[1] After giving all other water rights claimants in the Basin notice and an opportunity to conduct discovery as well as to file dispositive motions in accordance with Rule 1-071.2 NMRA, the district court entered its order granting the settlement motion for entry of partial final decrees describing the water rights of the Navajo Nation. The Court then entered the partial final judgment and decree of the water rights of the Navajo Nation, and the supplemental partial final judgment and decree of the water rights of the Navajo Nation. The non-settling parties objected to several terms of the Settlement Agreement

---

[1]Normally in an inter se proceeding, the parties objecting to settlement have the burden to prove the settlement is not fair, adequate, or reasonable. *See State ex rel. State Eng'r v. Aamodt*, 582 F. Supp. 2d 1313, 1317 (D.N.M. 2007); *In re Crow Water Compact*, 2015 MT 217, ¶ 28, 382 Mont. 46, 354 P.3d 1217. In the present case the district court shifted this burden to proponents of the Settlement. Moreover, the district court did not require those challenging the Settlement to make a showing that it would affect their rights, as is usually required. *See State ex rel. Office of State Eng'r v. Lewis*, 2007-NMCA-008, ¶ 16, 141 N.M. 1, 150 P.3d 375.

and to the inter se procedures adopted by the district court. After full briefing and argument the district court rejected the objections and issued its order approving the settlement agreement and proposed decrees (the Settlement). The district court concluded that the Settlement was fair, adequate, reasonable, and consistent with the public interest as well as all applicable laws.

{5} Although they have several issues in common, the non-settling parties have consistently refused to consolidate their appeals, so it will be necessary to address their claims in three separate opinions. To the extent Defendant herein, Gary Horner, advances arguments virtually identical to those advanced by the other defendants, this Court will dispose of those issues by reference to its previously filed opinions in the related San Juan adjudications.

**I.     Indian Tribes Are Not Required to Prove Immediate Beneficial Use to Quantify and Preserve Their Water Rights**

{6} Defendant Horner initially argues that "[s]tate law limits water rights to existing beneficial uses." Treaty rights of Indians are "not a grant of rights to the Indians, but a grant of right from them,—a reservation of those not granted." *United States v. Winans*, 198 U.S. 371, 381 (1905). "Trust obligations to Native Americans were enshrined in reserved water rights that exist without exercise and may be asserted as prior and more senior to allocated state water rights." Sally Fairfax, Helen Ingram, & Leigh Raymond, *Historical Evolution & Future of Natural Resources Law & Policy,*

*The Evolution of Natural Resources Law & Policy* 19 (Lawrence MacDonnell & Sarah F. Bates eds., 2010). As we explained in *Navajo Nation v. San Juan Agricultural Water Users Ass'n*, ___-NMCA-___, ¶ 16, ___ P.3d ___ (No. A-1-CA-33535), an Indian tribe's federal reserved water rights cannot be lost under state theories of failure to perfect by beneficial use. *See Arizona v. San Carlos Apache Tribe of Ariz.*, 463 U.S. 545, 574 (1983) ("[F]ederal law issues . . . should be performed by federal rather than state courts whenever possible."). New Mexico state law does not control water allocated to the Navajo Nation by the United States.

{7}     This disposes of several points of Defendant's appeal, to-wit:

> [(1) s]tate law limits water rights to existing beneficial uses; [(2) t]he New Mexico Court of Appeals has established that the federal reserved rights doctrine must be construed narrowly; [(3) t]he State of New Mexico has acknowledged that Indian tribes are not entitled to water rights for future uses; [(4) g]enerally, negotiated water rights settlements are inappropriate and violate the Constitution and laws of New Mexico[2]; [(5)] New Mexico law requires that water rights be determined by hydrographic surveys[3]; [(6) t]he Navajo [Nation] Settlement . . .

---

[2]This argument also ignores the fact that New Mexico has recognized and participated in several tribal water settlements. *See* Jicarilla Apache Tribe Water Rights Settlement Act, Pub. L. No. 102-441, § 2, 106 Stat. 2237 (1992); The Claims Resolution Act of 2010, Pub. L. 111-291, §§ 501, 601, 124 Stat. 3064 (Taos Pueblo Indian Water Rights Settlement Act and Aamodt Litigation Settlement Act). More specifically, the Legislature set aside funds for this and other settlements. Section 72-1-12.

[3]Both the State and the district court relied on the hydrographic survey conducted by the United States. This is standard and acceptable practice in New Mexico water law, and Defendant offers no admissible evidence to rebut this survey.

violates the [New Mexico Constitution] doctrine of separation of powers.[4]

{8}	This Court agrees with Defendant that whatever its viability generally, the State pueblo water rights doctrine is totally inapplicable to this case. We do not agree, however, that the New Mexico Supreme Court abolished federally reserved water rights in *State ex rel. Martinez v. City of Las Vegas*, 2004-NMSC-009, ¶ 1, 135 N.M. 375, 89 P.3d 47. *See* U.S. Const. art. VI (federal law supremacy clause). Indeed, Defendant admits, "since such rights are federal reserved rights they are not subject to state law." Moreover, as discussed in the *San Juan Agricultural Water Users Ass'n* case, even if it could be presumed that State law had some applicability herein, it would be preempted by federal law. *See* ___- NMCA-___, ¶ 14.

{9}	More fundamentally, Defendant's statement that "there really exists no federal reserved right for Indian tribes for future uses" is clearly in error. In *United States v. Ahtanum Irrigation District*, 236 F.2d 321, 327 (9th Cir. 1956), the Ninth Circuit went back to its 1908 precedent, *Conrad Inv. Co. v. United States*, 161 F. 829 (9th Cir. 1908), to again flatly reject the concept that Indian water allocations are frozen in time:

---

NMSA 1978, § 72-4-16 (1919).

[4]This argument was thoroughly discussed in *San Juan Agricultural Water Users Ass'n*, ___-NMCA-___, ¶¶ 9-13.

It is plain from our decision in the *Conrad Inv. Co.* case, that the paramount right of the Indians to the waters of Ahtanum Creek was not limited to the use of the Indians at any given date but this right extended to the ultimate needs of the Indians as those needs and requirements should grow to keep pace with the development of Indian agriculture upon the reservation. Some effort is made here to assert that the reservation of waters for the benefit of the Indians must be limited to the amount or quantity actually used beneficially by the Indians within some period of time or within what the court might find to be a reasonable time. . . . Nothing in the *Winters*[ *v. United States*, 207 U.S. 564 (1908)] case or in any other decided case lends any support to such an argument. As indicated, exactly the contrary was held in the *Conrad Inv. Co.* case[.]

*Ahtanum Irrigation Dist.*, 236 F.2d at 327 (citations omitted).

{10} Nor does logic support Defendant's time-limited rights theory. From the earliest reservations, the courts recognized that even if the United States Government could persuade tribes to adopt irrigated farming, they would clearly have to learn to apply this more agrarian lifestyle to often barren desert. Inherent in the learning curve would be trying various forms of irrigation such that tribal water allocations clearly could not be fixed at the time a reservation was created. *See United States v. Walker River Irrigation Dist.*, 104 F.2d 334, 339 (9th Cir. 1939).

**II.      A Viable Reservation Homeland Has Long Been a Recognized Criterion in Indian Water Law Cases**

{11} Defendant argues, as did the defendants in the *San Juan Agricultural Water Users Ass'n* case, that the district court impermissibly allocated water to the Navajo Nation based on the need to make their homeland viable now and in the future.

Defendant maintains, "[f]ederal reserved rights are limited to the minimal needs of a tribe, and do not include water rights for future uses." While it is true many of the early cases focused on the amount of water to provide a tribe an agricultural existence, recent judicial trends appear to recognize reservation allocations should not be limited to only an amount of water sufficient to support the pastoral life contemplated in the nineteenth century, but rather, calculated to provide the tribes sufficient water to allow them a moderate living in the twentieth century and thereafter. Indeed, several opinions specifically refer to the reservation goal of providing sufficient water to sustain a "permanent home." *See, e.g.*, *Winters*, 207 U.S. at 565; *Agua Caliente Band of Cahuilla Indians v. Coachella Valley Water Dist.*, 849 F.3d 1262, 1270 (9th Cir. 2017). The Navajo Nation Treaty of 1868 returned them to a portion of their ancestral territory as their "permanent home," the very language at issue in the *Winters* case. *Treaty with the Navajo*, art. 13, June 1, 1868, 15 Stat. 667.

{12}     Nor is Defendant's argument advanced by his analysis of the *Winters* doctrine. This Court can agree with Defendant that the rigid and hard to apply "practicably irrigable acreage" (PIA) standard is no longer the only appropriate measure of Native aboriginal or reservation-based water rights. The Court also agrees with Defendant that *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 686 (1979), requires an allocation of natural resources sufficient "to

provide the Indians with a livelihood—that is to say, a moderate living." Again this focuses on adapting the reservations to changing conditions. Barbara A. Cosens, *The Measure of Indian Water Rights: The Arizona Homeland Standard, Gila River Adjudication*, 42 Nat. Resources J. 835, 853 (2002).

{13}    As this Court explained in *San Juan Agricultural Water Users Ass'n*, the district court employed appropriately these more modern and flexible guidelines, rather than a strict PIA standard, in reaching its decision herein. *See* ___-NMCA-___, ¶¶ 24-27. The district court's decision therefore is not an abuse of discretion.

**III.    Defendant Fails to Cite Evidence That the Settlement Is Not Fair, Adequate, Reasonable, and Consistent With the Public Interest**

{14}    Given Defendant's failure to comprehend the federal law that governs the Indian water rights involved, this Court could simply ignore his grumbling about how the non-Indians have senior appropriation rights and "the [Office of the State Engineer] agreed to bundling up all of the undeveloped and unused water supply to give to the Navajos." However, these arguments are not only based on erroneous legal principles but on a misinterpretation or misrepresentation of the facts in this case so must be addressed.

{15}    Defendant admits "in the case of the Navajo Nation, such upper limit, based on the PIA standard, would be well in excess of all of the water available, due to the enormous size of the Navajo [Nation] Reservation." Since the Navajo Nation might

13

well be entitled to all the water in the San Juan Basin if the trial had proceeded, eliminating this risk was prudent advocacy for the State and benefits all users in the Basin. *See* Reid Peyton Chambers & John E. Echohawk, *Implementing the Winters Doctrine of Indian Reserved Water Rights: Producing Indian Water & Economic Development Without Injuring Non-Indian Water Users*, 27 Gonz. L. Rev. 447 (1991-92). The Settlement substantially limits the Navajo Nation's potentially disruptive claims to water rights in the San Juan Basin by adjudicating the Navajo Nation's water rights in a reduced amount to be exercised almost entirely under a junior priority date and with shortage sharing and other conditions to protect other water rights in the stream system.

{16} The district court explicitly contrasted the amount of water the potential trial evidence would allow the Navajo Nation with the amount contained in the Settlement saying the former

> establishes a reasonable basis for a potential claim for a total diversion of 920,745 afy and a total corresponding depletion of 591,401 afy. The Proposed Decrees, in contrast, limit total diversions to 635,729 afy, and total depletions to 334,542 afy. These limitations result in less diversion and consumptive use of water by the Navajo Nation in the Basin and ultimately reduce impacts on junior water users.

(Footnote omitted.)

{17} Indeed, as the district court found, "the total amount of water in the Settlement Agreement is less than the Navajo Nation's current[] federally authorized rights to

water pursuant to the 1962 NIIP Act and the long-established Hogback-Cudei and Fruitland-Cambridge irrigation projects." As important as the Navajo Nation's agreement to take a substantially reduced amount of total water is their agreement to have the majority of their water, almost 90 percent, allocated on a priority date of 1955 or later. This is more than a century later than its Reservation treaty.

{18} The Settlement also includes numerous other specific mitigating provisions as well. For example, when the direct flow of the San Juan River is insufficient to supply direct-flow diverters in New Mexico, the Navajo Nation is required to make up to 12,000 afy of water available to service its reserved rights for Shiprock municipal uses and the Hogback-Cudei and Fruitland-Cambridge irrigation projects prior to making a call for priority administration of the river system. This reduces the risk of shortage to direct-flow users.

**CONCLUSION**

{19} For the reasons stated, the district court's decision is affirmed.

{20} **IT IS SO ORDERED.**

_____

**BRUCE D. BLACK, Judge Pro Tem**

**WE CONCUR:**

_____
**LINDA M. VANZI, Chief Judge**

_____
**J. MILES HANISEE, Judge**